H.A. TRUE, Jr. & Jean D. True; Donald G. Hatten & Tamma T. Hatten; H.A. True, III & Karen S. True; Diemer D. True & Susan L. True; David L. True & Melanie A. True; Belle Fourche Pipeline Company; Black Hills Trucking, Inc.; Black Hills Oil Marketers, Inc.; Cambria Oil Company; Camp Creek Gas Company; Eighty–Eight Oil Company; Equitable Oil Purchasing Company; Reserve Oil Purchasing Company; Roosevelt Pipeline Company; Roughrider Pipeline Company; Smokey Oil Company; Toolpushers Supply Company; True Drilling Company; True Geothermal Drilling Company; True Geothermal Energy Company; True Land and Royalty Company; True Leasing Company; True Oil Company, and True Oil Purchasing Company, Plaintiffs and Appellants,

v.

M.K. Heidi HEITKAMP, State Tax Commissioner, Defendant and Appellee.

Civ. No. 900317.

Supreme Court of North Dakota.

May 21, 1991.

John W. Morrison (argued), of Fleck, Mather & Strutz, Bismarck, and Stanley Lowe and Ronald Morris, True Oil Co., Casper, Wyo., for plaintiffs and appellants.

Jo M. Noack (argued), Asst. Atty. Gen., State Tax Dept., Bismarck, for defendant and appellee.

GIERKE, Justice.

This is an appeal from a district court judgment affirming the Tax Commissioner's denial of appellants' claims for a refund of income taxes paid for the years 1973 through 1982. We affirm.

The appellants are individual members of the True family [the Trues] and partnerships, Subchapter S corporations, and Subchapter C corporations [the True Businesses] which, at all relevant times, were owned almost in their entirety by the Trues and were engaged in some aspect of the energy business.[1] Although the precise ownership in the True Businesses has varied from time to time, the businesses have essentially been owned by the Trues in the following proportions: H.A. True, Jr.—63%; Jean D. True—5%; Tamma T. Hatten—8%; H.A. True III—8%; Diemer D. True—8%; David L. True—8%. The Trues have been residents of, and the True Businesses have been domiciled in, Wyoming. With the exception of five of the business

---

1. According to the Trues, the True Businesses consist of the following:

"PARTNERSHIPS
1. Cambria Oil Company.
2. Eighty–Eight Oil Company.
3. True Drilling Company.
4. True Geothermal Energy Company.
5. True Leasing Company.
6. True Oil Company.
SUBCHAPTER S CORPORATIONS
1. Belle Fourche Pipeline Company.
2. Black Hills Oil Marketers, Inc.
3. Black Hills Trucking, Inc.
4. Equitable Oil Purchasing Company.
5. Reserve Oil Purchasing Company.
6. Roughrider Pipeline Company.
7. Smokey Oil Company, Inc.
8. True Geothermal Drilling Company.
9. True Oil Purchasing Company.
C CORPORATIONS
1. Camp Creek Gas Company.
2. Roosevelt Pipeline Company.
3. Toolpushers Supply Company.
4. True Land and Royalty Company."
Toolpushers Supply Company was partially owned by an employees' profit-sharing trust.

entities, all of the True Businesses conducted business both within and without North Dakota during 1973 through 1982.

From 1973 through 1982, two of the principal entities through which the Trues conducted their energy business, the True Oil Company and True Drilling Company partnerships, filed state income tax returns in North Dakota and elsewhere on a "separate accounting" basis. Under this method, a multistate taxpayer computes its income attributable to a certain state on the basis of those receipts and costs related to its in-state activities only, without regard to activities carried on in the other states. *See* R. Tannenwald, *The Pros and Cons of Worldwide Unitary Taxation*, 25 Tax Notes 649 (1984). During this period, the other True Businesses that conducted part of their business in North Dakota filed their state income tax returns in North Dakota and elsewhere on the basis of separate entity formulary apportionment. Under this method, each entity's business income earned both within and without North Dakota is apportioned to this state by using the three-factor formula prescribed in Chapter 57–38.1, N.D.C.C., the Uniform Division of Income for Tax Purposes Act [UDITPA]. *See* I J. Hellerstein, *State Taxation* ¶ 8.6 (1983); *International Minerals & Chemical v. Heitkamp*, 417 N.W.2d 791 (N.D.1987). The portion of business income attributable to North Dakota is determined by multiplying a business entity's total income by a fraction representing the arithmetic average of the ratios of sales, payroll, and property values within the state to those of the business as a whole. *See Minnesota Mining and Mfg. Co. v. Conrad*, 418 N.W.2d 276 (N.D.1987).

In November 1983 True Oil and True Drilling filed amended partnership returns for 1980, 1981, and 1982 changing their method of filing from separate accounting to separate entity formulary apportionment. The two companies also filed amended business and corporation privilege tax returns for 1980 and 1981. The Trues also filed amended individual income tax returns which reflected the changes in the partnership returns. Based on these returns, which the parties refer to as the "first amended returns," the Trues claimed refunds and interest totaling more than $2,200,000. The Commissioner denied the refund claims in February 1984. In response, the Trues filed protests which were denied by the Commissioner in September 1984.

In November 1984 the Trues filed administrative complaints and amended tax returns for 1973 through 1979 as well as a second set of amended returns for 1980 through 1982. These returns, which the parties refer to as the "second amended returns," were filed on the basis of the unitary combined method of reporting for all of the True entities that were engaged in the energy business. Under this method, a group of commonly owned and controlled businesses are essentially treated as a single entity and the overall income of the integrated businesses, excluding transactions between members of the group, is apportioned among the states in which the unitary group does business. *See Minnesota Mining and Mfg., supra.* Based on these combined reports, the Trues sought approximately $4,000,000 in refunds and interest.

The Commissioner denied these refund claims in July 1986. The Trues filed a protest in August 1986 and, following an audit of the Trues and the True Businesses, the Commissioner issued a notice of reconsideration in May 1988 again denying the refunds based on the second amended returns. The Trues responded by filing an administrative complaint for refund which was followed by an answer to the complaint by the Commissioner. After extended discovery, an administrative hearing was held in October 1989. The Commissioner issued an order denying the claim for refunds in March 1990. The district court subsequently affirmed the Commissioner's order. This appeal followed.

The appellants assert that the energy business conducted by the True Businesses was a unitary business which was required to allocate and apportion its total income within and without North Dakota for the years in question through the use of a combined report. According to the appel-

585

lants, both the reporting of income by True Oil and True Drilling on the basis of separate accounting and the failure to combine the income of the total unitary business were errors which resulted in the overpayment of taxes and which entitle the appellants to refunds under § 57–38–40, N.D.C.C.

The Commissioner rejected the appellants' assertion that they had a right to file on a combined reporting basis. The Commissioner determined, among other things, that North Dakota law does not permit the filing of a combined report that includes noncorporate taxpayers, and that, even if it was permitted, the True Businesses did not constitute a unitary business because no one person or entity exercised sole control over the businesses and was also included in the unitary group. We need not determine whether North Dakota law during the tax years in question authorized noncorporate entities to file a combined report because we agree with the Commissioner that, even if our law allowed combined reporting under these circumstances, the True Businesses did not constitute a unitary business.

■■■ In order to better understand the parties' positions, some background information is necessary. Under both the due process and commerce clauses of the United States Constitution, a state may not, when imposing an income-based tax, tax value earned outside of its borders. *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 164, 103 S.Ct. 2933, 2939, 77 L.Ed.2d 545 (1983); *ASARCO Inc. v. Idaho State Tax Comm.*, 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787 (1982). When a business enterprise operates in more than one state, "arriving at precise territorial allocations of 'value' is often an elusive goal, both in theory and in practice." *Container, supra.* For that reason, it "has long been settled that 'the entire net income of a corporation, generated by interstate as well as intrastate activities, may be fairly apportioned among the States for tax purposes by formulas utilizing in-state aspects of interstate affairs.' " *Exxon Corp. v. Wisconsin Dept. of Reve-*

*nue,* 447 U.S. 207, 219, 100 S.Ct. 2109, 2118, 65 L.Ed.2d 66 (1980) [quoting *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 460, 79 S.Ct. 357, 363, 3 L.Ed.2d 421 (1959)]. The "three-factor" apportionment formula employed under UDITPA, which North Dakota enacted in 1965, has not only been approved by the Supreme Court, but has become "something of a benchmark against which other apportionment formulas are judged." *Container, supra,* 463 U.S. at 170, 103 S.Ct. at 2943; *see also Trinova Corp. v. Michigan Dept. of Treasury,* —— U.S. ——, ——, 111 S.Ct. 818, 833, 112 L.Ed.2d 884 (1991); *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978).

■■■ The due process and commerce clauses also prohibit a state from taxing income arising out of a business's interstate activities unless there is a " 'minimal connection' or 'nexus' between the interstate activities and the taxing State, and 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.' " *Exxon, supra,* 447 U.S. at 219–220, 100 S.Ct. at 2118 [quoting *Mobil Oil Corp. v. Comm'r of Taxes of Vermont,* 445 U.S. 425, 436–437, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510 (1980)]. The "unitary business" principle, which we have recognized as an "interrelated part" of UDITPA formulary apportionment [*Minnesota Mining and Mfg., supra,* 418 N.W.2d at 277], provides that required nexus if a unitary business is, in fact, established. *Amerada Hess Corp. v. Director, Division of Taxation,* 490 U.S. 66, 73, 109 S.Ct. 1617, 1621, 104 L.Ed.2d 58 (1989); *F.W. Woolworth Co. v. Taxation and Revenue Dept.,* 458 U.S. 354, 364, 102 S.Ct. 3128, 3135, 73 L.Ed.2d 819 (1982). As the Supreme Court has noted, "the linchpin of apportionability in the field of state income taxation is the unitary-business principle." *Mobil, supra,* 445 U.S. at 439, 100 S.Ct. at 1232. A state may not tax a purported "unitary business" unless at least part of that business is conducted in the state. *Container, supra.*

Generally, a multijurisdictional unitary business group consists of "'functionally integrated corporate units which are so interrelated and interdependent that it becomes relatively impossible for one State to determine the net income generated by a particular corporation's activities within the State and therefore allocable to that State for purposes of taxation.'" *Minnesota Mining and Mfg., supra* [quoting *Caterpillar Tractor Co. v. Lenckos,* 84 Ill.2d 102, 49 Ill.Dec. 329, 337, 417 N.E.2d 1343, 1351 (1981), *appeal dismissed sub nom. Chicago Bridge & Iron Company v. Caterpillar Tractor Co.,* 463 U.S. 1220, 103 S.Ct. 3562, 77 L.Ed.2d 1402 (1983)]. Courts have employed various tests to determine whether a business enterprise is unitary for taxation purposes. The Supreme Court has recognized the amorphous nature of the unitary business principle and has refused to impose any particular test on all states as a requirement of constitutional law. Although the Supreme Court in *Container, supra,* 463 U.S. at 178 n. 17, 103 S.Ct. at 2947 n. 17, stated that there must be "a flow of *value*" between the integrated businesses as a constitutional prerequisite for an acceptable finding of a unitary business, the Court also made it clear that "there is a wide range of constitutionally acceptable variations on the unitary business theme." [Emphasis in original]. *See also* Case Comment, *Taxation—Federal Taxes: North Dakota's Unitary Taxation Method of Computing the Federal Income Tax Deduction for Multinational Corporations Held Improper,* 65 N.D.L.Rev. 619, 622 (1989).

The Supreme Court has articulated a "factors of profitability" test, which focuses on "functional integration, centralization of management, and economies of scale," for determining whether a unitary business exists. *Mobil, supra,* 445 U.S. at 438, 100 S.Ct. at 1232. *See also F.W. Woolworth, supra,* 458 U.S. at 364, 102 S.Ct. at 3135; *ASARCO, supra,* 458 U.S. at 317, 102 S.Ct. at 3109; *International Minerals & Chemical, supra,* 417 N.W.2d at 795. A multistate business has also been held to be a unitary business "when the operations conducted in one state benefit and are in turn benefited by the operations conducted in another state or states" [*Western Auto Supply Co. v. Commissioner of Taxation,* 245 Minn. 346, 71 N.W.2d 797, 804 (1955)], or "[i]f the operation of the portion of the business done within the state is dependent upon or contributes to the operation of the business without the state" [*Edison California Stores v. McColgan,* 30 Cal.2d 472, 183 P.2d 16, 21 (1947)]. One of the earliest tests to gain Supreme Court approval was the "three unities" test. In *Butler Bros. v. McColgan,* 17 Cal.2d 664, 111 P.2d 334, 341 (1941), *aff'd* 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942), the California Supreme Court held that a unitary business is

"established by the presence of the following circumstances: (1) unity of ownership; (2) unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use in its centralized executive force and general system of operation."

The Commissioner has adopted the "three unities" test for use in North Dakota. Although administrative rules regarding the three unities test have recently been promulgated by the Commissioner,[2]

---

**2.** Section 81–03–05.3–01, N.D.Admin.Code, which became effective March 1, 1990, provides in pertinent part:

"81–03–05.3–01. Definitions. As used in these sections, unless the context otherwise requires:

\* \* \* \* \* \*

"5. 'Unitary business' means a group of corporations carrying on activities the component parts of which transfer value among themselves through the unities of ownership, operation, and use. Whether a group of corporations is engaged in a unitary business depends on the facts and circumstances of each case. However, if unity of ownership exists, any or all of the following facts and circumstances will create a presumption that the unities of operation and use exist and, therefore, that the corporations are engaged in a unitary business:

"a. All activities of the corporations in the group are in the same general line or type of business.

"b. The activities of the corporations in the group constitute different steps in a vertically structured enterprise.

there were no written administrative rules on the subject during the tax years in question. According to the Commissioner, the Tax Department has a "long-standing" policy of applying the three unities test. Although unity of operation and use are not contested in this case, the Commissioner asserts that in construing the ownership requirement, the Tax Department has always stressed the element of control and has "never permitted a group of corporations to file a combined report unless controlling ownership was lodged in a single corporation, and it has never included a corporation in a unitary group unless more than fifty percent of its voting stock was owned by another member of the group." In sum the Commissioner has adopted the position, which the Trues claim to be erroneous, that in order to meet the ownership requirement of the three unities test, control must rest with one entity or, in this case, one person who is also included within the unitary group. The Commissioner determined that the True Businesses do not meet this requirement.

■ The Trues assert that the Commissioner's informal adoption of the three unities test and interpretation of the unity of ownership element during the tax years in question are invalid because they were not formally promulgated as rules in accordance with the Administrative Agencies Practice Act, Chapter 28–32, N.D.C.C. It is undisputed that during the relevant tax years no rules were promulgated pursuant to Chapter 28–32 which addressed combined reporting or the unitary business principle. Even if we were to agree with the Trues that these rules required formal promulgation, it does not automatically follow that the Trues are entitled to the relief they seek.

We have recognized that an administrative agency is not required to promulgate detailed rules interpreting every statutory provision that may be relevant to its· actions, or covering every conceivable situation which might come before it. *Amerada Hess Corp. v. Conrad,* 410 N.W.2d 124, 133 (N.D.1987). In cases where we have found regulations void for failure to comply with Chapter 28–32, we have generally either remanded so that the administrative agency may fully comply with the Administrative Agencies Practices Act [*Johnson v. N.D. Workers Compensation Bureau,* 428 N.W.2d 514, 520 (N.D.1988)], or we have remanded for redetermination under the relevant authorizing legislation only [*Mullins v. Dept. of Human Services,* 454 N.W.2d 732, 735 (N.D.1990)]. We are unaware of any authority that suggests the Commissioner's failure to properly promulgate a rule under Chapter 28–32 requires the Commissioner to accept a different unpromulgated rule or test urged by the Trues.

■ Resolution of the issue falls within our line of cases which holds that when an administrative agency interprets and implements a law which is of a complex and technical nature, the agency's interpretation will be upheld unless it exceeds the bounds of the authorizing legislation or is arbitrary and unjust. Generally, if the subject matter of a question before an administrative agency is of a highly technical nature, the agency expertise in that area is entitled to appreciable deference, and we are reluctant to substitute our judgment for that of the administrative agency. *Montana–Dakota Utilities Co. v. P.S.C.,* 413 N.W.2d 308, 312 (N.D.1987). For example, in *Gofor Oil, Inc. v. State,* 427 N.W.2d 104, 106 (N.D.1988), we upheld as

"c. The group of corporations is characterized by centralized management.
\* \* \* \* \* \*
"7. 'Unity of operation' means that the group of corporations contributes to or receives benefits from functional integration or economies of scale.
"8. 'Unity of ownership' means that the corporations in the group are under the common control of a single corporation, which is also a member of the worldwide group. Con-

trol is presumed to exist when the single corporation owns, directly or indirectly, more than fifty percent of the ownership interest of another corporation.
"9. 'Unity of use' means that the group of corporations contributes to or receives benefits from centralized management and policy formation."
The validity of these administrative rules is not before us in this appeal.

within the agency's authority an "informal policy" of the Industrial Commission for computing "average daily production" under a "somewhat complex" statute defining the term. Also, in *Montana–Dakota Utilities v. Public Service Commission*, 431, N.W.2d 276, 279–280 (N.D.1988), we held that the PSC had the discretionary authority under a statute to determine the methodology to be used in deciding whether a subsidiary made unreasonable profits in sales to a regulated utility, so long as the method chosen was neither arbitrary nor unjust. Because the attributes of a unitary business are of a technical and complex nature, we believe that the same principles noted in *Gofor Oil* and *Montana–Dakota Utilities* apply in deciding whether the Commissioner has chosen a valid method for determining whether a business enterprise comprises a unitary business group.

Published authority addressing the unity of ownership requirement of the three unities test is sparse. To our knowledge, only two cases have directly addressed the question whether unity of ownership can exist only when a single individual or entity owns a majority interest in each business to be included in the unitary group. In *Rain Bird Sprinkler Mfg. Corp. v. Franchise Tax Board*, 229 Cal.App.3d 784, 280 Cal.Rptr. 362 (1991), and *Hugo Neu–Proler v. Franchise Tax Bd.*, 195 Cal.App.3d 326, 240 Cal.Rptr. 635 (1987), the California Court of Appeal ruled that the Franchise Tax Board's requirement that majority ownership rest in a single individual or entity to satisfy the unity of ownership element was invalid under state law. Section 25105 of the California Revenue and Taxation Code defined ownership or control as follows: "Direct or indirect ownership or control of more than 50 percent of the voting stock of the taxpayer shall constitute ownership or control for the purposes of this article." The courts concluded that the very language of the statute—direct or *indirect* ownership or control—suggested

a legislative intent that there could be attribution of ownership between related stockholders or partners in satisfying the unity of ownership test. The court in *Rain Bird Sprinkler, supra,* 229 Cal.App.3d at 791–92, 280 Cal.Rptr. at 366–67, also declined to accept the administrative interpretation of the statute because of "a checkered pattern of interpretation by the State Board of Equalization with respect to the question of family control versus single individual or entity control as satisfying the unity of ownership requirement" and its "disagreement" with the administrative agency's bright-line test which it characterized as being "inconsistent with present corporate realities."

*Rain Bird Sprinkler* and *Hugo Neu–Proler* are distinguishable from the instant case. It is fundamental that an administrative regulation which goes beyond what the Legislature has authorized is void. *Moore v. North Dakota Workmen's Compensation Bureau*, 374 N.W.2d 71, 74 (N.D. 1985). Unlike California law, which had a statutory definition of ownership or control, North Dakota law did not specifically address this subject during the tax years in question. Indeed, according to the Commissioner, prior to 1987 [3] combined reporting was not specifically addressed in North Dakota statutory law but, rather, developed from the Commissioner's "administrative interpretations" of UDITPA. *See Minnesota Mining and Mfg., supra,* 418 N.W.2d at 278; Report of the North Dakota Legislative Assembly, Fiftieth Legislative Assembly, at pp. 183–184 (1987). Of course, the appellants, who seek to file a combined report, do not challenge the Commissioner's statutory authority to require combined reporting during the tax years in question. Nor do they question the Commissioner's general power to make rules for the administration of statutory duties. *See* § 57–38–56, N.D.C.C. Because of the lack of specific statutory authority addressing the subject of combined reporting or

---

3. We note that when the Legislature enacted the Water's Edge Method Election legislation in 1987, "affiliated corporation" was defined to mean "a parent corporation and any corporation of which more than fifty percent of the voting stock is owned directly or indirectly by the parent corporation or another member of the water's edge combined group." § 57–38.4–01, N.D.C.C. This legislation does not govern the present case.

ownership and control during this period, we are unable to conclude, as did the California court, that the Commissioner exceeded the bounds of the authorizing legislation in adopting the requirement that ownership or control must rest with one entity or individual who is also included within the unitary group. In addition, the Trues have not established that the Commissioner has inconsistently applied this informal requirement during the relevant tax years. Our review of the Commissioner's requirement is therefore limited to determining whether it is arbitrary or unjust.

The rationale for the Commissioner's requirement that one individual or entity exercise control over each member of the combined group is best explained by Professor Walter Hellerstein, the Department's expert witness in this case:

"Without control by ... one individual or entity holding the controlling ownership in all the entities that are to be combined in the combined group, there is simply no assurance that the entities will be operated as a unit. In other words, there is ... simply not the oneness or unity that gives rise to the justification for treating all of the income together. So as a theoretical basis, it's simply wrong. Moreover, from an administrative perspective it is really quite appropriate to take the position as almost every state in the union has, that you've got to have a bright-line administerable [sic] test for determining when you've got a unitary business. You can't in each case simply rely on the self-serving testimony of a group of taxpayers that says, 'We—we're all operating this thing together, we all have—make unanimous decisions, we have consensus decisionmaking and we're unitary.'

"Then if they decide next year that perhaps it would be more advantageous not to be unitary, they'd come in and say, 'Well, we don't agree very much, we really go our own separate ways and it would be more appropriate to have the income of this group attributed to us in our separate capacities.' It is simply impossible, I think—or not impossible—but it is certainly well within the authority of a—of a tax department to take the position because of the fundamental theory underlying the unitary doctrine that control and ownership must be vested in a single entity, be it an individual or a corporation."

The Commissioner's requirement that the single entity or person exercising control be included within the unitary group is founded on an analogy to a holding company which owns all of the stock of its subsidiaries:

"This exclusion from the unitary business of a parent company whose ownership of the stock of subsidiaries gives it control over their operations (one which in practice is virtually universally exercised, at least with respect to budgets, large expenditures, major policies, and the general mode of operations) is inconsistent with the basic concept of a unitary business. It is fundamental to the unitary doctrine that common control (as well as ownership) be present and be exercised within the enterprise, not by a corporation outside the enterprise. To exclude the owning, controlling, integrating parent company that binds the affiliated group into a unity is to play Hamlet without the Prince." I J. Hellerstein, *State Taxation* ¶ 8.11[6][e], at pp. 447–448 (1983) [Footnote omitted.]

■ For the reasons quoted above, we cannot say that the Commissioner's challenged requirements are arbitrary or unjust. We conclude that it was within the Commissioner's authority to determine that a unitary business requires the exercise of control by a single entity or individual who is a member of the unitary group.

■ The Commissioner found that the True Businesses were "controlled on consensus of the True family members regardless of voting interests" and that each interest owner had to agree on major decisions. The Commissioner also found that no individual member of the True family had been included in the combined return which formed the basis for the second amended returns. The Commissioner determined:

"It is uncontroverted in this action that H.A. True, Jr., who owned over fifty percent of the interest in each combined entity, did not actually exercise *sole* control of the True entities. The great weight of the testimony reveals that the entities were actually controlled on consensus of the True family regardless of the voting interest. In making major decisions, every interest owner, i.e. family member, regardless of percentage share of ownership, had to agree. Control was exercised by consensus of the interest owners." [Emphasis in original.]

We believe the Commissioner could reasonably determine from the evidence that unity of ownership was lacking in this case. Although H.A. True, Jr., at all relevant times owned more than 50 percent of the interest in each entity, the Supreme Court has pointed out that it is the actual exercise of control, rather than the potential or power to exercise that control, which establishes the control requirement. *F.W. Woolworth, supra,* 458 U.S. at 362, 102 S.Ct. at 3134; *ASARCO, supra,* 458 U.S. at 322, 102 S.Ct. at 3112. H.A. True, Jr., admitted that he did not exercise sole control over the True Businesses and that all of the partners had an equal vote when making business decisions. Based on this evidence, we conclude that the Commissioner did not err in determining that the True Businesses were not unitary and were therefore not entitled to file a combined report for the relevant tax years.

■ The Trues assert that they are, in any event, entitled to a refund based on their first amended returns. The Commissioner determined that:

"Because the Trues have replaced the amended returns for 1980, 1981 and 1982, filed in November 1983, with the second set of amended returns filed in 1984, the amended returns filed in November 1983 are not at issue in this action, and the Tax Commissioner's denial of the refund claims based on the amended returns filed in November 1983 is finally and irrevocably fixed."

The district court agreed, concluding that "the original claims for refund were clearly abandoned by the Trues in an entirely new approach taken when they filed their 'administrative complaint' with the Commissioner."

The record reflects that the Trues filed their first amended returns in November 1983 seeking $2,200,000 in refunds under § 57–38–40, N.D.C.C.,[4] for tax years 1981,

---

**4.** Section 57–38–40, N.D.C.C., which sets forth the procedure for income tax refund claims, provides in pertinent part:

"*57–38–40. Claim for credit or refund.*

"1. ... a taxpayer may apply to the tax commissioner for credit or refund of an overpayment of any tax imposed by this chapter within three years after the due date of the return or within three years after the return was filed, whichever period expires last. Refund claims properly verified and approved by the tax commissioner shall be audited and paid as are other claims against the state.

\* \* \* \* \* \*

"4. Every claim for credit or refund shall be made by filing with the tax commissioner an amended return, or other report as prescribed by the tax commissioner; accompanied by a statement outlining the specific grounds upon which the claim for credit or refund is based.

"5. If the tax commissioner disallows a claim for credit or refund, in part or in full, the tax commissioner shall notify the taxpayer accordingly. The decision of the tax commissioner denying a claim for credit or refund is final and irrevocable thirty days after the date the notice is mailed to the taxpayer unless, within this thirty-day period, the taxpayer has filed a written protest with the tax commissioner.

"6. The protest shall set forth the grounds on which the protest is based, along with such other information as may be required by the tax commissioner. If the taxpayer has so requested, the tax commissioner may grant the taxpayer or his authorized representative an informal conference.

"7. The tax commissioner shall reconsider the denial of the claim for credit or refund after the filing of a protest. The reconsideration may include the further examination by the tax commissioner or his representative of a taxpayer's books, papers, records, or memoranda, including corporate minutes and committee notes.

"8. Within a reasonable period of time after protest the tax commissioner shall notify the taxpayer of his reconsideration of claim for credit or refund. If the decision of the tax commissioner is a denial, the decision is final and irrevocable unless the taxpayer within fifteen days following the date of the tax com-

1982 and 1983. These returns were based on separate entity formulary apportionment and were not based on a combined report. On February 10, 1984, the Commissioner denied the refund claims, asserting that the partnership income was properly reflected for North Dakota purposes on the returns as originally filed on the basis of separate accounting. The Trues filed a written protest, but the Commissioner again denied the claims in September 1984, stating that "after due consideration of the facts, [the Department] continues to believe that your returns as originally filed were correct." The September 1984 correspondence further informed the Trues that the letter constituted "your notification of our denial of your refund claims in accordance with Section 57–38–40(8)" and informed them of their right "to file a formal administrative complaint which must state in detail the factual and legal basis for your claim for refund."

The Trues responded in November 1984 with administrative complaints seeking refunds for tax years 1973 through 1982 totaling approximately $4,000,000. The administrative complaints stated that:

> "Plaintiffs hereby make formal Complaint and request an administrative hearing for all tax years having the common issue regarding proper and Constitutional application of unitary principles. This Complaint demands refund for both overpaid North Dakota income tax and for any privilege taxes related thereto. Plaintiffs file herewith amended income tax returns reflecting the proper unitary tax assessment under applicable North Dakota Law Sections and related regula-

tions. Such returns are attached hereto as Exhibits 'A' through 'K'...."

The attached returns, or second amended returns, were filed based on the unitary combined method of reporting.

In July 1986 the Commissioner issued a notice of denial of claims for refund, stating that the November 1984 complaint accompanying the second amended returns was "based on new and different contentions," that the complaint did not respond to the Commissioner's September 1984 denial as required by § 57–38–40(8), and, as a result, that the Commissioner's denials of the first amended returns became "final and irrevocable." The Trues responded by filing protests which were denied by the Commissioner. The Trues filed a new administrative complaint in May 1988 which, in addition to incorporating by reference the previous November 1984 complaint, alleged that "[d]uring all periods of their operations, the Businesses were controlled and operated by the Trues as a single unitary business enterprise at every level of operation;" that "the net income the Trues derived from the activities of the Businesses in North Dakota ... is required to be determined as a matter of ... law by what is commonly known as the 'combined reporting' system;" and that "[s]ince all of the Businesses were conducted as a single unitary business ... North Dakota's constitution, laws and administrative practice, require the Businesses to use the combined reporting system to apportion net income to North Dakota."

In the prayer for relief, the Trues and True Businesses sought computation of their tax liabilities on a combined reporting basis. Although the Trues also sought

missioner's decision seeks formal administrative review of the tax commissioner's reconsideration of claim for credit or refund by filing a complaint and requesting an administrative hearing. The provisions of chapter 28–32 shall apply to and govern the administrative hearing procedure, including appeals from any decision rendered by the tax commissioner. Upon written request of a taxpayer, the tax commissioner may grant a reasonable extension of time for the filing of a complaint.

"9. If the tax commissioner determines that an amount in excess of the correct

amount of tax, interest, or penalty due from any person has been paid by or on behalf of such person because of income tax withheld or declaration of estimated tax, the tax commissioner may approve a refund of the excess amount which shall be paid to that person in the manner provided for payment of other claims against the state, except that it shall not be necessary to first file a claim for refund if the amount to be refunded was paid with respect to a return or report filed by such person with the tax commissioner in the form prescribed therefor."

"[s]uch other and further relief deemed appropriate in the premises, such as the correction of computation and accounting errors, etc.," it is clear that the Trues did not seek reconsideration of the first amended returns. Indeed, the administrative complaint effectively alleged that the first amended returns were "in error":

> "6. For the tax years in question, the North Dakota income tax returns filed by the Businesses were in error in that they were all filed on a separate entity basis (apportionment or separate accounting), rather than on a combined unitary system basis."

On the record before us, we cannot say that the Commissioner erred in determining that the Trues had abandoned their reliance on the first amended returns and that the Commissioner's previous denial of refunds based on those returns had become final. The first amended returns, filed on a separate entity formulary apportionment basis, were not the focus of attention at the administrative hearing. Generally, on appeal from administrative agency decisions, a reviewing court will confine its review to those issues which were raised before the agency. *E.g., Choukalos v. N.D. State Personnel Bd.,* 429 N.W.2d 441, 444 (N.D. 1988). More specifically, we have said that "[i]t is, of course, elementary that even in an administrative hearing the issues are limited to those raised by the pleadings and a hearing should be confined to the points at issue." *Williams Electric Coop. v. Montana–Dakota Utilities Co.,* 79 N.W.2d 508, 524 (N.D.1956). Although the rule that issues must be made before the administrative agency to preserve them on appeal is not absolute [*Nelson v. Cass County Social Services,* 424 N.W.2d 371, 375 n. 5 (N.D.1988) ], we see no reason to deviate from the general rule in this case. Section 57–38–40(4) requires that amended returns for tax refunds be accompanied by a statement outlining the "specific grounds" upon which the refund claim is based. The obvious purpose for such a requirement in the complex area of tax law is to delineate and restrict the issues to be considered in a taxpayer's refund action in order to lessen administrative and judicial burdens. *See*

*generally Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, ——, 110 S.Ct. 688, 700, 107 L.Ed.2d 796 (1990). The Commissioner was not required to consider and grant refund claims based on the first amended returns which the taxpayers themselves claimed in the administrative complaint to be in error.

The Trues assert that the Commissioner was nevertheless obligated to grant refund claims on some unspecified grounds not urged at the administrative level because the evidence demonstrated "that the taxpayers' original returns were not correct." The Trues rely on *Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293 (1932), in which the Supreme Court stated that "the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax. This involves a redetermination of the entire tax liability." However, the broad language in *Lewis* cannot be read to require the Commissioner to recompute the Trues' tax liability under refund claims which have been abandoned or under some other unasserted method. More recently, the Supreme Court has noted:

> "In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover. *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932). It is not enough for him to demonstrate that the assessment of the tax for which refund is sought was erroneous in some respects." *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976).

We agree with the Commissioner and the district court that the Trues abandoned their claims for refund under the first amended returns and that the Commissioner's denial of these claims became final.

In approximately two pages of their appellate brief, the Trues summarily assert that the Commissioner in these proceedings has committed no fewer than seven constitutional violations under the due process and equal protection clauses of the state and federal constitutions and the "open courts" provision of Article I, Section 9 of the North Dakota Constitution. They pro-

vide us with no detailed constitutional analysis or reasoning. We have often advised that one who attacks a legislative enactment or governmental action on constitutional grounds should bring up the heavy artillery or forego the attack entirely. *Meyer v. City of Dickinson,* 451 N.W.2d 113, 117 (N.D.1990); *Southern Valley Grain Dealers v. Board of County Commissioners,* 257 N.W.2d 425, 434 (N.D. 1977). Nothing in the Trues' argument persuades us that the Commissioner's actions are unconstitutional.

Our disposition of this appeal renders it unnecessary to address the other issues raised by the parties. Accordingly, the judgment is affirmed.

ERICKSTAD, C.J., and LEVINE and MESCHKE, JJ., concur.

VANDE WALLE, Justice, concurring and dissenting.

I concur with the majority that the True Businesses did not constitute a unitary business on the record before us. Because, as the majority opinion observes, we should defer to agency expertise in construing "a law which is of a complex and technical nature," I agree we should affirm that determination. But it is because of the complexity of the law that I cannot agree with the majority's disposition of the second issue, *i.e.,* whether or not the Trues abandoned their claim for a refund based on their first amended returns.

There is nothing inherently evil in taxpayers attempting to reduce their tax obligations through the use of existing statutes and rules and regulations. When the Trues attempted to claim a refund based on separate entity formulary apportionment, those claims were denied. The denial was noninformative except to advise the Trues of their right to file an administrative complaint "which must state in detail the factual and legal basis for your claim for refund." The Trues could have filed a complaint challenging the denial of the refund claim which they based on a separate entity formulary appointment; rather, they filed a complaint seeking a refund based on unitary principles.

Waiver and abandonment of an appeal is a voluntary relinquishment of a known right and must be made intentionally and with knowledge of the circumstances. *Bindel v. Iowa Manufacturing Co. of Cedar Rapids,* 197 N.W.2d 552 (Iowa 1972). Had the law regarding these various provisions been clear; had the Commissioner adopted formal rules and regulations setting forth her interpretation of those laws and had her denial of the first refund claim been informative rather than formalistic, I would agree that the Trues abandoned their first refund claim by filing a second claim based on the unitary combined method of reporting. None of those conditions existed.

Rather than written administrative rules, the Commissioner relied on "long-standing" policies. The law is not clear and, as the majority opinion concedes, there is little published authority addressing the unity of ownership requirement of the three-unities test, the primary factor in the first issue before us. Although I agree that the lack of written rules should not be used as a weapon against the Commissioner in her construction of the statute, neither do I believe the Commissioner should use it as a weapon in her argument that the Tax Department's unwritten policies were so well known to the Trues that their filing of the administrative complaints constituted an abandonment of the first claim for refund. The only thing made apparent in the denials of the claims for refund was that whatever the claim, or the basis of the claim, it would be denied by the Commissioner. In this respect the Trues might well have believed they were involved in a shell game in which, only after picking the shell they believed appropriate, would the Commissioner reveal her interpretation of the law contained under that shell.

I cannot agree that under the facts of this case, involving statutes that were not previously construed and unwritten policies, the action of the Trues in filing the formal complaint constitutes an abandonment of their prior position. I do not know if the Trues are entitled to a refund under the separate entity formulary apportion-

ment method but equity demands they be permitted to pursue that claim for a refund. I would remand with direction that the Trues's formal complaint be construed to include that claim for refund or that they be permitted to file a complaint based on that claim and that the procedures for consideration of that complaint proceed before the Commissioner.