NL INDUSTRIES, INC., Shaffer, Inc. (as successor in interest to The Rucker Company) an SW Servicing Company, Petitioners and Appellants,

v.

NORTH DAKOTA STATE TAX COMMISSIONER, Respondent and Appellee.

Civ. No. 920191.

Supreme Court of North Dakota.

March 24, 1993.

Pearce & Durick, Bismarck, for petitioners and appellants; argued William P. Pearce.

Robert W. Wirtz (argued), Asst. Atty. Gen., Tax Dept., Bismarck, for respondent and appellee.

RALPH J. ERICKSTAD, Surrogate Judge.[1]

NL Industries, Inc., Shaffer, Inc., as successor in interest to The Rucker Company, and SW Servicing Company (hereinafter collectively referred to as NL) have appealed a district court judgment affirming an

---

1. Surrogate Judge Ralph J. Erickstad was Chief Justice at the time this case was heard and served as surrogate judge for this case pursuant to Section 27–17–03, N.D.C.C.

order of the State Tax Commissioner denying NL's income tax refund claims and imposing additional income tax assessments. We affirm.

NL and its subsidiaries did business in the United States, including North Dakota, and in various foreign countries from 1979 through 1984. Based on net operating losses in 1983 and 1984, NL sought income tax refunds for 1980 and 1981. The Commissioner denied the refund claims and assessed additional taxes for 1979 through 1982. NL filed a complaint with the Commissioner and an administrative hearing was held.

In the administrative hearing, the parties stipulated, among other things, that: (1) On April 15, 1987, NL filed amended income tax returns for 1983 and 1984 that showed net operating losses (NOL's) for those years and, therefore, that no income taxes were payable for those years; (2) On April 15, 1987, NL filed amended returns for 1980 and 1981, showing NOL carrybacks from 1983 and 1984, resulting in a decrease in taxable income in 1980 and 1981, and claiming refunds of a portion of the taxes paid for 1980 and 1981; (3) On November 3, 1987, the Commissioner denied NL's claims for refunds for 1980 and 1981 and issued a notice of deficiency, asserting that additional income taxes were due for 1979 through 1982, "on the grounds that the carryback of the NOL's for federal income tax purposes reduced the federal tax paid for those years and consequently required a decrease in the federal income tax deduction allowable for North Dakota income tax purposes for 1980 and 1981;" (4) On June 7, 1990, the Commissioner issued a notice confirming the previous denial of NL's refund claims and assessing additional taxes; (5)

"When computing a North Dakota net operating loss, it has been the longstanding administrative practice of the Commissioner, beginning prior to the years in question in this case, to:

"a. Require that a corporation increase federal taxable income by the

amount of any federal net operating loss deduction; and

"b. Require that a corporation deduct the amount of net operating loss attributable to North Dakota sources only;"

and (6) "It is the position of [NL] that for the years in question there was no North Dakota statutory authority which would require a corporation to increase federal taxable income by the amount of any federal net operating loss deduction."

After the hearing, the hearing officer issued recommended findings of fact and conclusions of law, and a recommended order affirming the Commissioner's June 7, 1990, assessment of additional income taxes and the denial of NL's refund claims. Based upon the hearing officer's recommended findings, conclusions, and order, the Commissioner affirmed the June 7, 1990, assessments and denied the refund claims. The district court affirmed the Commissioner's order.

NL asserts that the methodology required by the Commissioner for the treatment of net operating loss deductions is erroneous as a matter of law. NL also asserts that the methodology required by the Commissioner for determination of the federal income tax deduction in this case is "CONTRARY TO LAW AS ESTABLISHED BY THIS COURT."

"Under North Dakota law, federal taxable income is the simplified starting point for computing state income tax." *International Minerals & Chem. Corp. v. Heitkamp*, 417 N.W.2d 791, 794 (N.D.1987). Section 57–38–01(8), N.D.C.C., provides that the "taxable income" of a corporation means "the taxable income as computed ... for federal income tax purposes ...., plus or minus such adjustments as may be provided by this act and chapter or other provisions of law."

For the tax years in question, there was no express statutory provision for adjusting a corporation's taxable income to reflect a net operating loss.[2] In 1989, howev-

---

**2.** For the tax years in question, § 57–38–01.3, N.D.C.C., provided for the following adjustments to taxable income:

er, § 57–38–01.3(1), N.D.C.C., was amended, at the request of the Commissioner, to add what is now codified as subdivision i to provide that a corporation's federal taxable income shall be:

"i. Increased by the amount of any special deductions and net operating loss deductions to the extent that these items were deducted in determining federal taxable income."

An assistant attorney general, testifying on House Bill 1164 (enacted as S.L.1989, Ch. 708), said that the proposed provision quoted above represented what had been the Commissioner's policy for "[a]t least ten years" and, although not cast in the form of a rule, had been reflected in the tax return forms. She also testified:

"We have had no corporations take us to court on this policy. We are routinely asked my [sic] multi-national corporations what our policy is and where in the law we have the authority to do that.

That is why we put this language into it."

She further stated that "[t]he proposed subdivision to subsection 1 of § 57–38–01.3 would clarify the Department's policy and thereby assist the Department in enforcing North Dakota's tax laws." The following written testimony was provided on House Bill 1164:

"1. Purpose: To clarify the law regarding net operating losses and special deductions.

"Current interpretation of the Tax Department is to require corporations to add back net operating losses and special deductions.

"2. If this bill fails, the Tax Department will continue its policy. However, the Tax Department would prefer that the legislature say yes or no not duck the issue.

\*　　\*　　\*　　\*　　\*　　\*

"1. The taxable income of a corporation as computed pursuant to the provisions of the Internal Revenue Code of 1954, as amended, shall be:

"a. Reduced by any interest received from obligations of the United States that is included in taxable income or in the computation thereof on the federal return.

"b. Reduced by any other income included in the taxable income, or in the computation thereof, on the federal return which is exempt from taxation by this state because of the provisions of the constitution of this state or the United States.

"c. Reduced by the amount of federal income taxes, paid or accrued as the case may be during the applicable tax year, adjusted by any federal income tax refunds, to the extent that such taxes were paid or accrued upon income which becomes a part of the North Dakota taxable income.

"d. Increased by the amount of any income taxes, including income taxes of foreign countries, or franchise or privilege taxes measured by income, to the extent that such taxes were deducted to determine federal taxable income.

"e. Increased by the amount of any interest and dividends from foreign securities and from securities of state and their political subdivisions exempt from federal income tax, provided that interest upon obligations of the state of North Dakota or any of its political subdivisions shall not be included.

"f. Reduced by the amount of net income not allocated and apportioned to this state under the provisions of chapter 57–38.1, but only to the extent that the amount of net income not allocated and apportioned to this state under the provisions of that chapter is not included in any adjustment made pursuant to the preceding subdivisions.

"g. Reduced by dividends or income received by any person from stock or interest in any corporation, the income of which has been assessed and paid by a corporation under this chapter, received by the taxpayer and included in the gross income within the income year if such corporation has reported the name and address of each person owning stock and the amount of dividends of income paid each such person during the year, but when only part of the income of any corporation shall have been assessed and income tax paid under this chapter, only a corresponding part of the dividends or income received therefrom shall be deducted.

"Provided, however, that each adjustment in the above subdivisions authorized under law shall be allowed only to the extent that the adjustment is allocated and apportioned to North Dakota income.

"2. The tax commissioner is hereby authorized to prescribe rules and regulations to prevent requiring income that had been previously taxed under this chapter from being taxed again because of the provisions of this chapter and to prescribe rules and regulations to prevent any income from becoming exempt from taxation because of the provisions of this chapter if it would otherwise have been subject to taxation under the provisions of this chapter."

"Therefore, if legislature agrees with the Tax Department's interpretation of adding back special deductions and net operating losses it should adopt the clarifying language and make it retroactive. If the legislature disagrees with the Tax Department's interpretation, it should state this and find a different revenue source for $6 million and possibly $15 million."

The foregoing testimony and the Legislature's enactment of the new subdivision proposed by the Commissioner lend credence to the Commissioner's present argument that the 1989 amendment "simply affirmed the Commissioner's long standing administrative practice." "A reenacted administrative regulation carries presumptive weight in the construction of a statute. This is especially true where evidence is available that the administrative interpretation was made known to the legislative body or its committees." Norman J. Singer, *Sutherland Statutory Construction* § 49.09 at 69 (5th ed. 1992). Here, the Commissioner's administrative interpretation was clearly made known to the Legislature.

We have held that adjustments or deductions may only be made or taken in computing taxes if specifically authorized by statute. *See, e.g., International Minerals & Chem. Corp. v. Heitkamp, supra; Running v. Tax Commissioner*, 313 N.W.2d 772 (N.D.1981); *Erdle v. Dorgan*, 300 N.W.2d 834 (N.D.1980). NL contends that "[p]rior to 1989 the federal NOL deduction could not be added back to federal taxable income in determining North Dakota taxable income because there was no statutory authorization for such an adjustment."

NL explains in its brief the Commissioner's treatment of NOL's and the treatment NL advocates:

"For a number of years prior to 1989, . . . including the years in question in this case, despite the lack of any statutory authorization, the Commissioner required by administrative policy, that the starting point—federal taxable income—be adjusted by adding back any federal NOL deduction. The Commissioner then allowed a 'North Dakota NOL deduction'

to be taken after the North Dakota taxable income was determined, for the carryback or carryforward of net operating losses due to North Dakota operations. This is a methodology that is provided by law in some states and has been called the 'method conformity' approach to treating the NOL on the state level, whereas the methodology used by NL, which is the only methodology permitted by North Dakota law prior to 1989, has been termed the 'amount conformity' approach. *See* J. Michael Yarborough, *State Income Tax Treatment of NOL Carryovers: A Framework for Analysis*, in *Journal of State Taxation*, Vol. 10 (Summer 1991), at 3–9."

According to NL, under "the 'amount conformity' method, mandated by North Dakota statute prior to July 1, 1989, there is no addback to federal taxable income for the NOL deduction." On the other hand, according to NL, under the "'method conformity' approach imposed by the Commissioner, the federal NOL deduction is added back, so that the starting point does not reflect the NOL deduction but the taxpayer receives a separate state NOL deduction." Of this "method conformity" approach, NL concedes that "[t]here is nothing inherently wrong with such a methodology," observes that "it cannot be used unless permitted by the law of the state in question," and argues that, prior to the 1989 amendment, "North Dakota statutes did not permit the use of the 'method conformity' methodology." We disagree.

Prior to 1989, § 57–38–01.3, N.D.C.C., providing for adjustments to a corporation's federal taxable income for computing state income taxes, did not expressly address the subject of net operating losses. The absence of any treatment of net operating losses in a comprehensive state income tax statute, where one would expect to find the subject addressed, created a latent ambiguity. *See Thompson v. Thompson*, 391 N.W.2d 608 (N.D.1986); *Harney v. Wirtz*, 30 N.D. 292, 152 N.W. 803 (1915). Further evidence of a latent ambiguity may be found in the fact that when the Legislature federalized our corporate income tax scheme, it repealed former

§ 57–38–22(4)(b), N.D.C.C., which authorized a corporation to carry forward a NOL, and did not provide in new § 57–38–01.3, N.D.C.C., set forth in footnote 2, *supra*, a provision for adjusting a corporation's taxable income to reflect a NOL. This failure to provide an adjustment for NOL's conflicts with the legislative intent stated in § 57–38–01.1, N.D.C.C.:

> "*It is the intent of the legislative assembly to* simplify the state income tax laws and to demonstrate that federal legislation is not necessary to deal with certain interstate tax problems, by adopting the federal definition of taxable income as the starting point for the computation of state income tax by all taxpayers and providing the necessary adjustments thereto to *substantially preserve and maintain existing exemptions and deductions.*"

(Emphasis added.)

Because of the statute's latent ambiguity, we believe that the Legislature implicitly delegated to the Commissioner the duty of formulating a method of treating net operating losses by interpreting the income tax statutes in an attempt to fulfill the Legislature's ambiguously expressed intent.[3]

As we have already noted, NL stipulated that, for purposes of determining a corporation's North Dakota income tax obligation, the Commissioner's longstanding administrative practice had been to require a corporation to increase its federal taxable income by the amount of any federal net operating loss deduction it had taken and to deduct only the amount of net operating loss attributable to North Dakota sources. Thus, as asserted by NL, in construing our corporate income tax provisions, the Commissioner's longstanding practice had been to apply the "method conformity" approach to dealing with net operating losses.

"In construing a statute of doubtful meaning the court will give weight to the long-continued practical construction placed thereon by the officers charged with the duty of executing and applying the statute." *Giese v. Engelhardt*, 175 N.W.2d 578, Syllabus ¶ 5 (N.D.1970). An administrative agency's practical construction of a statute is entitled to some weight if it does not contradict clear and unambiguous statutory language. *Schaefer v. Job Service North Dakota*, 463 N.W.2d 665 (N.D.1990); *Peterson v. Heitkamp*, 442 N.W.2d 219 (N.D.1989); *Rocky Mtn. Oil & Gas Ass'n v. Conrad*, 405 N.W.2d 279 (N.D.1987). As we said in *True v. Heitkamp*, 470 N.W.2d 582, 587 (N.D.1991):

> "Resolution of the issue falls within our line of cases which holds that when an administrative agency interprets and implements a law which is of a complex and technical nature, the agency's interpretation will be upheld unless it exceeds the bounds of the authorizing legislation or is arbitrary and unjust. Generally, if the subject matter of a question before an administrative agency is of a highly technical nature, the agency expertise in that area is entitled to appreciable deference, and we are reluctant to substitute our judgment for that of the administrative agency."

Read together, §§ 57–38–01(8) and 57–38–01.3, N.D.C.C., are not statutes "to be understood after a light skim through." *Lanterman v. Dorgan*, 255 N.W.2d 891, 895 (N.D.1977). The statutory provisions involved here are of a "complex and technical nature," the Commissioner's expertise in this area "is entitled to appreciable deference, and we are reluctant to substitute our judgment for that of the administrative agency." *True v. Heitkamp, supra*, 470 N.W.2d at 587.

Good reasons appear to support the Commissioner's choice of approaches in dealing with net operating losses. Use of the amount conformity method, as contended for by NL, can result in either an overattri-

---

**3.** The Administrative Agencies Practice Act, Ch. 28–32, N.D.C.C., and the Legislature's ability to retract a delegation of authority provide adequate safeguards to deter arbitrary decision-making by the Commissioner, thus avoiding any question about an unconstitutional delegation of legislative authority. *Trinity Medical Center v. North Dakota Bd. of Nursing*, 399 N.W.2d 835 (N.D.1987).

bution or an underattribution of losses to the State. "Thus, planning and manipulation are at least theoretically possible for the multistate corporation under the amount conformity approach." J. Michael Yarborough, *State Income Tax Treatment of NOL Carryovers: A Framework for Analysis,* 10 Journal of State Taxation 6 (1991). Furthermore, the Commissioner might have based the decision not to adopt the amount conformity method on a concern for the possible injustice it might have upon some interstate taxpayers. As J. Michael Yarborough observed: "[A]n interstate taxpayer would systematically lose some of its state-specific losses under a *uniformly applied* amount conformity multistate system and would be theoretically taxed on more than 100 percent of its income." *Id.* at 21. (Emphasis added.) Under the method conformity or manner conformity approach, which "is probably better described as a separate state NOL approach" (*id.* at 4), on the other hand, "no overattribution or underattribution of losses occurs ..., as is possible under amount conformity." *Id.* at 9. Method conformity thus "provides a precision in the carryover of losses at the state level that is lacking under the amount conformity approach" (*id.* at 9), although at a cost of additional "administrative burden imposed on the state taxing system." *Id.* at 9. Yarborough opines, however: "In the majority of cases, considered individually and overall, roughly the same result may occur under the administratively simpler amount conformity approach." *Id.* at 9.

The Commissioner's interpretation is a reasonable interpretation, which "does not clearly contradict the statutory language" (*Schaefer v. Job Service North Dakota, supra,* 463 N.W.2d at 667), and does not appear to "exceed[ ] the bounds of the au-

thorizing legislation or ... [be] arbitrary and unjust." *True v. Heitkamp, supra,* 470 N.W.2d at 587. We conclude that the methodology required by the Commissioner for the treatment of net operating loss deductions is not erroneous as a matter of law.

█ NL filed North Dakota income tax returns for the years in question on the basis of a worldwide unitary combination.[4] NL had a negative United States source income for the years in question. NL contends that the Commissioner's methodology for treating the federal income tax deduction allowed by § 57–38–01.3(1)(c), N.D.C.C., of a taxpayer filing on the basis of a worldwide unitary combination and reporting negative United States source income is unlawful because it is contrary to our decision in *Minnesota Mining & Mfg. Co. v. Conrad,* 418 N.W.2d 276 (N.D.1987) (hereinafter, *3M* ) and violates NL's equal protection rights.

For the years in question, § 57–38–01.-3(1)(c), N.D.C.C., provided that, in determining a corporation's North Dakota income tax obligation, the corporation's federal taxable income should be:

"Reduced by the amount of federal income taxes, paid or accrued as the case may be during the applicable tax year, adjusted by any federal income tax refunds, to the extent that such taxes were paid or accrued upon income which becomes a part of the North Dakota taxable income."

Prior to our decision in *3M,* the Commissioner computed a unitary taxpayer's federal tax deduction by apportioning on a worldwide basis the federal income tax paid by the taxpayer on its United States source income only. The Commissioner required worldwide apportionment of federal

---

4. "Under this method, the income of the corporation and all of its foreign subsidiaries and other associated corporations throughout the world is combined to determine the worldwide income of the unitary business group. Intercorporate dividends or other transfers of funds among the members of the unitary group are eliminated so that income will not be counted twice in determining the combined worldwide income.... Thus, under UDITPA's three-factor

formula, apportionment is accomplished by determining the ratio of property, payroll and sales in the state to the unitary business group's worldwide property, payroll and sales. The resulting ratio is then multiplied by the total worldwide income of the unitary group to reflect the income that is taxable by the state." *Minnesota Mining & Mfg. Co. v. Conrad,* 418 N.W.2d 276, 277 (N.D.1987).

income tax paid after foreign tax credits were taken by the taxpayer for foreign taxes paid on its foreign income. In *3M, supra,* 418 N.W.2d at 279, we observed: "The Commissioner's method, which indiscriminately mixes incompatible concepts, clearly creates what we believe to be an unintended internal inconsistency in the application of § 57–38–01.3(1)(c), N.D.C.C." We also noted:

> "It is therefore apparent that under the Commissioner's method the extent of the federal income tax deduction is dependent solely on whether the source of the unitary business' income is foreign or domestic. We do not believe that this was intended by the Legislature when it enacted the federal income tax deduction statute."

418 N.W.2d at 280.[5] We went on to hold that the Commissioner's method was improper:

> "We conclude that the Commissioner's method of determining 3M's federal income tax deduction, which mixes the use of worldwide combined income with federal income taxes paid only on federal taxable income, is improper."

418 N.W.2d at 280. We did not direct the Commissioner to use any particular arithmetic method to compute 3M's federal income tax deduction on remand.

In response to our decision in *3M*, the Commissioner adopted a rule, N.D.A.C. Ch. 81–03–05.4, for use in computing a taxpayer's federal income tax deduction under § 57–38–01.3(1)(c), N.D.C.C. N.D.A.C. § 81–03–05.4–04(1), however, provides that "this subsection cannot be used if either or both North Dakota taxable income or income relating to federal income tax paid is less than zero."

NL contends that the Commissioner's treatment of negative United States source income under the administrative rule is contrary to our decision in *3M* because "[f]or a unitary group with a negative United States source income, ... the Commission-

er's methodology is exactly as it was prior to the 3M decision." NL further argues that because North Dakota, under worldwide combination, treats the domestic parent and all of the foreign subsidiaries as one unit, the Commissioner must, under the *3M* case, "treat the aggregate worldwide taxes, not merely the federal taxes, as the basis for the deduction." We disagree.

Our decision in *3M* dealt with unitary groups with positive United States source income. It did not purport to address the taxation of unitary groups with negative United States source income. Therefore, whether the Commissioner's method of dealing with the federal income tax deduction of a unitary group with a negative United States source income is consistent or inconsistent with *3M* is irrelevant.

■ NL contends that the Commissioner's method of treating the federal income tax deduction allowed by § 57–38–01.3(1)(c), N.D.C.C., violates its equal protection rights because it arbitrarily discriminates between corporations with positive United States source incomes and those with negative United States source incomes.

The Commissioner responded to NL's argument on this issue by generally asserting that NL has not been deprived of equal protection, contending that NL has the burden of establishing a constitutional violation, and by arguing that "[t]here is no invidious discrimination in this case because the Commissioner has not treated NL differently from any other taxpayer in its class, i.e., a taxpayer with a negative income relating to federal income tax paid."

"The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* —— U.S. ——, ——, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1, 12 (1992). Because no fundamental right or inherently suspect charac-

---

5. We note that this observation was based upon an analysis of two hypothetical taxpayers, one of which had equal United States source and foreign source incomes, while the other had only United States source income. Neither hypothetical fits this case. NL had foreign source income and a negative United States source income.

teristics are involved that would warrant heightened review, "the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." — U.S. at —, 112 S.Ct. at 2331–2332, 120 L.Ed.2d at 12. "This standard is especially deferential in the context of classifications made by complex tax laws." — U.S. at —, 112 S.Ct. at 2332, 120 L.Ed.2d at 13.

"As a general rule, 'legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.'" *Nordlinger v. Hahn, supra,* — U.S. at —, 112 S.Ct. at 2331, 120 L.Ed.2d at 12 [quoting *McGowan v. Maryland,* 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)]. Under the rational basis standard of review ordinarily applied in economic matters not involving suspect classifications or fundamental rights, "we uphold legislation unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose.... Stated otherwise, we sustain a statute if any set of facts reasonably may be conceived to justify it." *Best Products Co., Inc. v. Spaeth,* 461 N.W.2d 91, 96 (N.D. 1990). "Legislatures are not required to achieve a perfect equality when drafting economic or social laws." *Id.* at 97. "It is within the legislature's power to choose to achieve its goals in part, or in stages ... 'The legislature may select one phase of one field and apply a remedy there, neglecting the others.'" *Id.* at 98 [quoting *Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573 (1955)]. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution "does not require the adoption of an iron rule of equal taxation or prevent differences in taxation or discretion in the selection of subjects or reasonable classification of subjects for taxation." *Signal Oil & Gas Co. v. Williams County,* 206 N.W.2d 75, 81–82 (N.D.1973). "Under the rational basis standard of review, a legislative classification will be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate government interest." *Lee v. Job Service North Dakota,* 440 N.W.2d 518, 519 (N.D.1989).

"[T]he Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger v. Hahn, supra,* — U.S. at —, 112 S.Ct. at 2334, 120 L.Ed.2d at 15–16. While a governmental decisionmaker need not have articulated a purpose for a classification, for purposes of judicial review there must be an identifiable purpose that may conceivably or reasonably have been that of the governmental decisionmaker:

"Nevertheless, this Court's review does require that a purpose may conceivably or 'may reasonably have been the purpose and policy' of the relevant governmental decisionmaker. *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 528–529, 79 S.Ct. 437, 442, 3 L.Ed.2d 480 (1959). See also *Schweiker v. Wilson,* 450 U.S. 221, 235, 101 S.Ct. 1074, 1083, 67 L.Ed.2d 186 (1981) (classificatory scheme must 'rationally advanc[e] a reasonable and *identifiable* governmental objective' (emphasis added))."

*Nordlinger v. Hahn, supra,* — U.S. at —, 112 S.Ct. at 2334–2335, 120 L.Ed.2d at 16.

One unarticulated purpose that the governing decisionmaker, the Commissioner, might have sought to promote through the challenged treatment of negative United States source income is the provision of an incentive to encourage unitary groups to increase their United States source income vis-a-vis their foreign source income through additional investment or improving efficiency. That is an identifiable purpose that may conceivably or may reasonably have been the purpose of the Commissioner. The Commissioner "may have conceived of" that or other good purposes, "and that is a sufficient basis for sustaining" the Commissioner's action. *Snyder's Drug Stores, Inc. v. North Dakota State Bd. of Pharmacy,* 219 N.W.2d 140, 151 (N.D.1974). Considering NL's arguments in light of the foregoing tenets of construc-

tion, we are not persuaded that NL has shown that the Commissioner's method of treating NL's negative United States source income violated NL's right to equal protection.

Affirmed.

VANDE WALLE, C.J., and LEVINE and MESCHKE, JJ., concur.

J. PHILIP JOHNSON, J., who was a member of the Court when this case was heard, did not participate in this decision.

NEUMANN and SANDSTROM, JJ., not being members of the Court when this case was heard, did not participate in this decision.