2005 ND 155

**AMERADA HESS CORPORATION; Tioga Gas Plant, Inc.; Solar Gas, Inc.; and AH 1980 Program, Inc., Appellants**

v.

**STATE of North Dakota, by and through its TAX COMMISSIONER, Cory Fong, Appellee.**

No. 20040378.

Supreme Court of North Dakota.

Aug. 31, 2005.

John W. Morrison (argued), Fleck, Mather & Strutz, Bismarck, N.D., and Joseph M. Aspray (appeared), Senior Tax Counselor, Woodbridge, N.J., for appellants.

Robert W. Wirtz (argued) and Donnita A. Wald (appeared), Special Assistant Attorneys General, Bismarck, N.D., for appellee.

MARING, Justice.

[¶ 1] Amerada Hess Corporation ("Amerada"), Tioga Gas Plant, Inc. ("Tioga"), Solar Gas, Inc. ("Solar"), and AH 1980 Program, Inc. ("AH") appealed from a judgment affirming an order of the State Tax Commissioner assessing them more than $3,000,000 in additional back taxes, penalty and interest. We conclude the Commissioner did not err in his interpretation of the applicable tax statutes in assessing the additional taxes, penalty and interest. We affirm.

I

[¶ 2] Amerada and its wholly-owned subsidiaries, Tioga, Solar and AH, each conducted business in North Dakota during tax years ending December 31, 1994, through December 31, 1998. Amerada was part of a unitary business group during those tax years that elected to apportion its income under the water's edge method allowed by N.D.C.C. ch. 57–38.4. The Commissioner audited Amerada's 1994 through 1998 tax returns and issued a notice of determination on November 13, 2000, that assessed additional tax, penalty and interest in the amount of $2,385,604, $119,280, and $756,184, respectively. Amerada protested the determination and, after an informal conference held in June 2001 to attempt to resolve the parties' differences concerning the audit, the Commissioner issued a notice of reconsideration and assessment. Amerada filed an administrative complaint on November 26, 2001, challenging the Commissioner's stance on two issues the parties failed to

resolve. Amerada claimed the Commissioner incorrectly concluded that the amount of foreign taxes it paid, which is treated under federal law as a dividend, may be included as a dividend for purposes of North Dakota apportionable income but may not be treated as a dividend and partially excluded under N.D.C.C. § 57–38.4–02(2), which allows a partial exclusion for "foreign dividends." Amerada also claimed the Commissioner incorrectly concluded that a taxpayer who has elected to apportion its income under the water's edge method must include both the income of an 80/20 subsidiary corporation and dividends distributed from that income in its North Dakota apportionable income because this allegedly results in improper double taxation.

[¶ 3] A hearing was held before an administrative law judge ("ALJ") on February 10, 2004. In recommended findings of fact, conclusions of law, and order, the ALJ ruled in favor of the Commissioner. The Commissioner adopted the ALJ's recommendations and assessed Amerada additional income tax of $2,298,737, penalty of $114,937, and interest of $1,001,947. Amerada and its subsidiaries appealed to the district court, which affirmed the Commissioner's decision. This appeal followed.

## II

[¶ 4] Amerada and its subsidiaries argue the Commissioner erred as a matter of law in assessing additional taxes, penalty and interest for the tax years in question.

[¶ 5] Our review of a decision by an administrative agency is governed by N.D.C.C. ch. 28–32. *State ex rel. Clayburgh v. American West Community Promotions, Inc.*, 2002 ND 98, ¶ 5, 645 N.W.2d 196. As we said in *Vogel v. Workforce Safety and Ins.*, 2005 ND 43, ¶ 5, 693 N.W.2d 8 (quoting *Elshaug v. Workforce Safety & Ins.*, 2003 ND 177, ¶ 12, 671

N.W.2d 784), this Court has a limited role in appeals from administrative agency decisions:

Under N.D.C.C. §§ 28–32–46 and 28–32–49, the district court, and this Court on further appeal, must affirm an administrative agency decision unless one of the following is present:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

We exercise restraint in deciding whether an agency's findings of fact are supported by a preponderance of the evidence, and we do not make independent findings or substitute our judgment for that of the agency. *Barnes v. Workforce Safety and Ins.*, 2003 ND 141, ¶ 9, 668 N.W.2d 290. "We decide only whether a reasoning mind reasonably could have decided the agency's findings were proven by the weight of the evidence from

the entire record." *Id.* "Questions of law, including the interpretation of a statute, are fully reviewable on appeal from an administrative decision." *Id.*

### A

[¶ 6] Amerada and its wholly-owned subsidiaries, Tioga, Solar and AH (collectively "Amerada"), contend the Commissioner erred in refusing to allow partial exclusion of I.R.C. § 78 dividends they received because they assert those dividends constitute "foreign dividends" for purposes of N.D.C.C. § 57–38.4–02(2). Some background is helpful to understand the parties' positions.

[¶ 7] Because Amerada conducted business both within and without North Dakota during the pertinent tax years, it must apportion its business income under a three-factor formula set forth in the Uniform Division of Income for Tax Purposes Act ("UDITPA"), N.D.C.C. ch. 57–38.1. Under this formula, to determine the portion of business income attributed to North Dakota, a corporate taxpayer's "income is multiplied by a fraction representing the arithmetic average of the ratios of sales, payroll, and property values within the state to those of the corporation as a whole." *Minnesota Mining and Mfg. Co. v. Conrad,* 418 N.W.2d 276, 277 (N.D.1987). An interrelated part of UDITPA formula apportionment is the unitary business principle, which is applied to " 'a group of functionally integrated corporate units which are so interrelated and interdependent that it becomes relatively impossible for one State to determine the net income generated by a particular corporation's activities within the State and therefore allocable to that State for purposes of taxation.' " *Id.* at 277 (quoting *Caterpillar Tractor Co. v. Lenckos,* 84 Ill.2d 102, 49 Ill.Dec. 329, 417 N.E.2d 1343, 1351 (1981)). The unitary

business method takes the combined overall worldwide income of the corporate taxpayer and all of its foreign and domestic subsidiaries and "apportions it among the states in which the enterprise carries on its business on the theory that activities in each of the states where an enterprise operates contribute to its overall profit." *Minnesota Mining,* 418 N.W.2d at 277. After eliminating intercorporate dividends or other transfers of funds among the members of the worldwide unitary business group, the adjusted amount is multiplied by the UDITPA apportionment formula to reflect the income that is taxable in North Dakota. *Id. See also* N.D.C.C. § 57–38.4–01(9) (defining worldwide combined report as "a combined report with respect to a unitary affiliated group irrespective of the country or countries in which any member of the affiliated group is incorporated or conducts business activity").

[¶ 8] Although the Commissioner since 1973 has required worldwide unitary apportionment, the legislature in 1987 enacted N.D.C.C. ch. 57–38.4, which allows a corporation required to file a worldwide unitary combined report to elect to apportion its income using the "water's edge" method. *Minnesota Mining,* 418 N.W.2d at 278 n. 2. In general, the water's edge method attempts to limit the reach of unitary income taxation to the borders of the United States. *Id.* Under the water's edge method, the water's edge group is limited to a list of entities described in N.D.C.C. § 57–38.4–01(8).

[¶ 9] Amerada's federal taxable income is relevant in calculating its state tax liability because, under North Dakota law, federal taxable income is the simplified starting point for computing state income tax. *Hamich, Inc. v. State,* 1997 ND 110, ¶ 16, 564 N.W.2d 640. The relevant federal tax laws concerning Amerada's first issue in-

volve the foreign dividend "gross-up." In *International Minerals and Chem. Corp. v. Heitkamp,* 417 N.W.2d 791, 794 (N.D. 1987), this Court explained the foreign dividend gross-up rules:

> In computing its federal income tax liability, a corporate taxpayer which pays income tax to a foreign country may either deduct the tax paid to the foreign country under I.R.C. § 164(a)(3) or credit that amount under I.R.C. § 901 against its tax liability. While § 901 provides a credit for foreign taxes a corporation actually paid, I.R.C. § 902 additionally allows a domestic corporation, owning at least ten percent of the voting stock of a foreign subsidiary from which it receives a dividend, a derivative credit for the foreign income taxes paid by its foreign subsidiary on its accumulated profits. In effect, under § 902 the domestic corporation is "deemed" to have paid a portion of the foreign taxes actually paid or accrued by the foreign subsidiary. See B. Bittker and J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 17.11 (4th ed.1979); 34 Am.Jur.2d *Federal Taxation* ¶ 8412 (1987).
>
> If a corporate taxpayer elects to take the § 902 "deemed paid" foreign tax credit rather than the deduction, I.R.C. § 78 requires that the domestic corporation add to its gross income the amount of the "deemed paid" foreign taxes. This amount, commonly referred to as "gross-up," is treated under § 78 as a "dividend" received by the domestic corporation from the foreign subsidiary. *See* B. Bittker and J. Eustice, *supra.* [I]t generally remains more advantageous for a domestic corporation to elect the "deemed paid" foreign tax credit than to take a deduction since a deduction from income serves only to cut taxable income while the credit reduces dollar for dollar the actual federal tax due.

*See* 34 Am.Jur.2d *Federal Taxation* ¶ 8419 (1987).

[¶ 10] In *International Minerals,* 417 N.W.2d at 795, the taxpayer excluded the gross-up amount from its state tax returns and the Commissioner disallowed the exclusion because North Dakota's income tax statutes did not expressly allow corporations a deduction for taxes paid to a foreign country. The taxpayer argued that if North Dakota taxed gross-up income, an "offsetting adjustment" was necessary to correct an " 'unconstitutional distortion' " caused by the fictitious nature of the gross-up amount. *Id.* at 796. This Court rejected the taxpayer's argument that inclusion of the gross-up amount, without recognizing an offsetting adjustment for state tax purposes, violated the taxpayer's due process rights:

> Having elected the benefit of the § 902 "deemed paid" foreign tax credit, IMC in effect chose not to deduct the foreign taxes paid by its foreign subsidiaries but to instead treat them as "dividends" and therefore "gross income" for purposes of the Internal Revenue Code. We do not believe due process requires that IMC be freed from this choice for state tax purposes. "The propriety of a deduction does not turn upon general equitable considerations . . . [but] 'depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed.' " *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974)[quoting *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934)]. Because North Dakota does not statutorily recognize a deduction for § 78 "gross-up" income, IMC may not exclude the "gross-up" from the amount of federal

taxable income reported on its state income tax return.

*Id.*

[¶ 11] *International Minerals* was decided after N.D.C.C. ch. 57–38.4 had been enacted, but before the legislation became effective. During the tax years in question in this case, Amerada's foreign subsidiaries paid foreign taxes. Amerada elected to take the federal "deemed paid" foreign tax credit and was required to include the gross-up amount in its income for federal tax purposes. Amerada also elected to file its state tax return using the water's edge method. Section 57–38.4–02(2), N.D.C.C., provides

2. All corporations electing the water's edge method must include the income and apportionment factors of the water's edge group. Foreign dividends and income from 80/20 corporations must be included as follows:

a. An existing corporation must include fifty percent of foreign dividends and sixty percent of income from 80/20 corporations. However, an existing corporation that increases and maintains a threshold activity by twenty-five percent or more, but not by business reorganization or acquisition, is only required to include thirty percent of foreign dividends and thirty percent of income from 80/20 corporations.

b. A new corporation must include thirty percent of foreign dividends and thirty percent of income from 80/20 corporations.

c. For taxable years beginning after December 31, 1994, all corporations making the water's edge election may reduce the inclusion to include thirty percent of foreign dividends and thirty percent of income from 80/20 corporations.

"Foreign dividends" are defined in N.D.C.C. § 57–38.4–01(4) as:

any dividend received by a member of the water's edge group from any affiliated corporation incorporated outside the fifty states and District of Columbia, including amounts included in income computed under sections 951 through 954 of the Internal Revenue Code.

Amerada contends that the I.R.C. § 78 gross-up amounts included in its federal tax returns qualify as a "foreign dividend" for purposes of partial exclusion under state law. In effect, Amerada argues N.D.C.C. ch. 57–38.4 is currently the statutory "offsetting adjustment" that was missing when *International Minerals* was decided.

[¶ 12] Amerada's argument that gross-up amounts constitute foreign dividends requires that we interpret the meaning of N.D.C.C. §§ 57–38.4–01(4) and 57–38.4–02(2). In *Harter v. North Dakota Dep't of Transp.*, 2005 ND 70, ¶ 7, 694 N.W.2d 677 (quoting *Phipps v. North Dakota Dep't of Transp.*, 2002 ND 112, ¶ 7, 646 N.W.2d 704 (citations omitted)), we said:

Our primary objective in the interpretation of a statute is to ascertain the intent of the legislature. We look first to the language of the statute. If the language of a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit. If a statute's language is ambiguous or of doubtful meaning, we may consider extrinsic aids, including legislative history, along with the language of the statute, to ascertain legislative intent.

"A statute is ambiguous if it is susceptible to meanings that are different, but rational." This Court "presume[s] the Legislature did not intend an absurd or ludicrous result or unjust conse-

quences," and "construe[s] statutes in a practical manner and give[s] consideration to the context of the statutes and the purposes for which they were enacted."

[¶ 13] Amerada argues that, although N.D.C.C. § 57–38.4–01(4) does not expressly list I.R.C. § 78 gross-up amounts as foreign dividends subject to partial exclusion under N.D.C.C. § 57–38.4–02(2), the reference to the I.R.C. §§ 951 through 954 amounts, otherwise commonly known as Subpart F income, is prefaced by the term "including," which ordinarily is not a term of limitation, but a term of enlargement. *See Hilton v. North Dakota Educ. Ass'n*, 2002 ND 209, ¶ 12, 655 N.W.2d 60; *Thompson v. Associated Potato Growers, Inc.*, 2000 ND 95, ¶ 12, 610 N.W.2d 53; *Lucke v. Lucke*, 300 N.W.2d 231, 234 (N.D. 1980); *see also* North Dakota Legislative Drafting Manual 107 (1987) ("An exhaustive definition uses the word *means* while a partial definition uses the word *includes*"). Amerada contends that, because Subpart F income, like I.R.C. § 78 gross-up amounts, is treated under the federal tax laws as a "deemed dividend," the gross-up amounts are included within the statutory definition of foreign dividends. The Commissioner argues I.R.C. § 78 gross-up amounts are not considered foreign dividends under the statute because those amounts are not dividends actually received, but constitute foreign taxes paid. The Commissioner also argues they are not foreign dividends under the statute because, unlike Subpart F income, I.R.C. § 78 gross-up amounts are not expressly mentioned in the statute. Because the statute is susceptible to rational, but different meanings concerning whether I.R.C. § 78 gross-up amounts qualify as foreign dividends, we conclude the statute is ambiguous and it is therefore appropriate to look to the available legislative his-

tory. *Western Gas Res., Inc. v. Heitkamp*, 489 N.W.2d 869, 872–73 (N.D.1992).

[¶ 14] Chapter 57–38.4, N.D.C.C., had its genesis in House Bill 1064 introduced at the 50th session of the legislative assembly in 1987. *See* 1987 N.D. Sess. Laws ch. 702. The proposed legislation was the result of a study by the Interim Committee on Taxation. *See* Report of the N.D. Legis. Council 183–86 (1987). Exhibits provided to that Committee detailing the "Six Approaches to Unitary Taxation" and the "Fiscal Impact Analysis" of the various approaches list "Foreign dividends" and "Section 78 gross-up" in separate categories. Section 6 of House Bill 1064, as originally introduced, provided in relevant part:

SECTION 6. Treatment of dividends. For purposes of this Act all of the following apply:

1. Dividends received from corporations incorporated outside the fifty states and District of Columbia, to the extent taxable, shall be deemed income subject to apportionment.

. . . .

3. Amounts included in income under sections 951 through 964 of the Internal Revenue Code shall be deemed dividends from corporations outside the fifty states and District of Columbia.

. . . .

5. Deemed distributions defined by section 78 of the Internal Revenue Code and corresponding amounts with respect to deemed dividends in subsection 2 shall be excluded from the income of the water's edge combined group.

The original draft of the proposed legislation treated Subpart F income and I.R.C. § 78 gross-up income differently, subjecting the former to apportionment and ex-

cluding the latter from the income of the water's edge group.

[¶ 15] Proposed amendments to House Bill 1064 were offered on March 13 and March 17, 1987, that completely changed the text of the original bill. However, both of these proposed amendments continued to provide that " '[f]unctionally related income' . . . does not include the gross-up of foreign taxes computed for the foreign tax credit." Proposed Amendments to Engrossed House Bill No. 1064 § 1 (March 13, 1987) (prepared by Tax Department staff for Sen. Satrom); Senate Amendments to Engrossed House Bill No. 1064 § 1 (March 17, 1987) (prepared by Tax Department staff for Sen. Satrom). Another proposed amendment to the bill was offered on April 10, 1987, that again changed much of the text of the original bill and the other proposed amendments. However, the proposed amendment continued to treat Subpart F income and gross-up income differently, providing that "[a]mounts included in income under sections 951 through 964 of the Internal Revenue Code shall be deemed dividends from corporations outside the fifty states and District of Columbia" and that "[d]eemed distributions defined by section 78 of the Internal Revenue Code and corresponding amounts with respect to deemed dividends in subsection 2 shall be excluded from the income of the water's edge combined group." Proposed Amendments to Engrossed House Bill No. 1064 § 5 (April 10, 1987) (prepared by Legislative Council staff for Rep. Moore). The version of House Bill 1064 that was eventually passed after being referred to a conference committee during the waning days of the legislative session bears little resemblance to the prior versions of the bill. As enacted, House Bill 1064 for the first time specifically defined "[f]oreign dividends" as "including amounts included in income computed under sections 951 through 954 of the Internal Revenue Code," but did not mention I.R.C. § 78 deemed distributions.

[¶ 16] The committee minutes do not specifically state why I.R.C. § 78 gross-up income was not, as was Subpart F income, listed as being included within the definition of "foreign dividends." The minutes do reflect that lawmakers were concerned about balancing the loss of tax revenue resulting from allowance of water's edge filing with fairness to the multinational corporations doing business within the state in an effort to be competitive with other states' corporate tax rates. *See Hearing on H.B. 1064 Before the House Finance and Taxation Comm.*, 50th N.D. Legis. Sess. (Jan. 26, 1987) (testimony of Rep. Schneider; Rep. Moore; John Walstad, Legislative Council staff; Bob Kessel, State Tax Department). *Hearing on H.B. 1064 Before the House Finance and Taxation Conference Comm.*, 50th N.D. Legis. Sess. (April 9, 1987) (testimony of Rep. Moore; Rep. Schneider; Bob Kessel, State Tax Department); *Hearing on H.B. 1064 Before the House Finance and Taxation Conference Comm.*, 50th N.D. Legis. Sess. (April 14, 1987) (testimony of Rep. Moore; Rep. Schneider; Sen. Dotzenrod); *Hearing on H.B. 1064 Before the House Finance and Taxation Conference Comm.*, 50th N.D. Legis. Sess. (April 16, 1987) (testimony of Rep. Moore; Rep. Schneider; Sen. Dotzenrod).

[¶ 17] The legislative history shows that Subpart F income and I.R.C. § 78 deemed distributions were specifically mentioned and treated differently in preliminary drafts of and amendments to House Bill 1064. The final version of the bill contains a definition of foreign dividends that includes Subpart F income but does not mention I.R.C. § 78 deemed distributions. We are convinced that the legislature, having specifically differentiated between Subpart F income and I.R.C. § 78

deemed distributions in the earlier drafts of the legislation, would have expressly mentioned I.R.C. § 78 deemed distributions as being included as foreign dividends if it had intended them to be given the same preferential treatment as Subpart F income. We conclude that I.R.C. § 78 deemed distributions are not "foreign dividends" for purposes of N.D.C.C. §§ 57–38.4–01(4) and 57–38.4–02(2).

[¶ 18] Amerada raises several other arguments challenging the Commissioner's refusal to recognize I.R.C. § 78 gross-up amounts as foreign dividends. Amerada relies on *Dow Chem. Co. v. Commissioner of Revenue,* 378 Mass. 254, 391 N.E.2d 253, 264–66 (1979), and *Dow Chem. Co. v. Director of Revenue,* 787 S.W.2d 276, 284–86 (Mo.1990), to support its argument that the gross-up amounts should be considered foreign dividends under North Dakota law. The statutes at issue in both of these cases simply allowed deductions for corporate dividends, and the courts concluded that if the tax authority adopted the fictional aspect of gross-up amounts as income for purposes of inclusion, the tax authority could not reject the fictional aspect for purposes of exclusion as a deductible dividend. Those statutory deductions for dividends differ from North Dakota law, which specifically mentions as deductible portions of Subpart F income. Amerada also argues that, because both Subpart F income and § 78 gross-up amounts are considered "deemed dividends" under federal tax law, *see, e.g., Dow Chemical,* 787 S.W.2d at 277, 286 (indicating DISC income, Subpart F income, and § 78 gross-up amounts are "deemed dividends"), they should be treated alike under N.D.C.C. § 57–38–01(14), which directs that any "term, as used in this code, as it pertains to the ... reporting of income, deductions, or exemptions ... has the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required or contemplated." However, we are not for purposes of state law defining a term differently than the term is defined under the federal tax laws. Rather, we hold that the legislature has chosen to treat these two types of "deemed dividends" differently for purposes of partial exclusion, and Amerada has cited no authority indicating the legislature lacks the power to do so. There may be several policy reasons that would support deduction of § 78 gross-up amounts under North Dakota law. However, the "propriety of a deduction does not turn upon general equitable considerations ... [but] "depends upon Legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." " *International Minerals,* 417 N.W.2d at 796 (quoting *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974)).

[¶ 19] Amerada also argues that it should prevail because, "if a tax statute contains any ambiguities, it must be strictly construed against the state." We believe Amerada oversimplifies this maxim of statutory construction. Amerada relies on *American West,* 2002 ND 98, ¶ 14, 645 N.W.2d 196 (quoting *Rocky Mountain Oil & Gas Ass'n v. Conrad,* 405 N.W.2d 279, 281 (N.D.1987)), and other cases in which we said, "[I]f a tax statute is ambiguous so that the legislative intention with respect to the meaning of the statute is doubtful, the doubt must be resolved in favor of the taxpayer." This statement does not mean any ambiguous tax statute must be strictly construed against the state. *American West,* at ¶ 14, and the other cases relied upon by Amerada recognize that the primary purpose of statutory construction is to ascertain the intent of the legislature and that a court may resort to other rules

of statutory construction, including extrinsic aids, to interpret an ambiguous tax statute. *See also Western Gas,* 489 N.W.2d at 872–73; *Great N. Ry. Co. v. Flaten,* 225 N.W.2d 75, 78 (N.D.1974); *Great N. Ry. Co. v. Severson,* 78 N.D. 610, 618, 50 N.W.2d 889, 892–93 (1951); *Standard Oil Co. v. State Tax Comm'r,* 71 N.D. 146, 150, 299 N.W. 447, 449 (1941); *Goldberg v. Gray,* 70 N.D. 663, 670, 297 N.W. 124, 127 (1941). We agree with the reasoning of the Arizona Court of Appeals in *Centric–Jones Co. v. Town of Marana,* 188 Ariz. 464, 937 P.2d 654, 659 (App.1996) (citations omitted), when faced with a similar argument that all ambiguities in tax statutes must be resolved in favor of the taxpayer, with the result that no power to tax may be found:

> We do not read this [maxim] as absolving us of our duty to find legislative intent through statutory construction whenever, on an initial reading, the subject statute yields an ambiguity. Yet that is what Centric's interpretation ... would require.
>
> We see the function of the maxim as follows. If, when the court concludes its process of construction, an ambiguity nevertheless remains, the maxim does generally dictate a result in favor of the taxpayer. Centric's approach, however, would sidestep the process of construction entirely and apply the maxim prematurely.

This reasoning comports with our prior caselaw. *See, e.g., Western Gas,* 489 N.W.2d at 873 ("Although we generally attempt to resolve questions of doubtful legislative intent in favor of the taxpayer ..., the legislative history, as a whole, establishes a clear legislative intent"); *Goldberg,* 70 N.D. at 670, 297 N.W. at 127 ("We do not question the rule [of strict construction against the tax authority]. However, the ultimate purpose sought to be attained by the construction of any statute is to arrive at the intention of the lawmaking body that enacted it"); *see also District of Columbia v. Acme Reporting Co.,* 530 A.2d 708, 712–13 (D.C.Ct.App. 1987) (applying all rules of statutory construction to interpretation of ambiguous tax statute); *Parr v. Dep't of Revenue,* 276 Or. 113, 553 P.2d 1051, 1053 (1976) (concluding "there should not be separate and different rules of statutory construction for ambiguous tax statutes than for other ambiguous statutes passed by the legislature"); *Sharp v. Park 'N Fly of Texas, Inc.,* 969 S.W.2d 572, 574 (Tex.Ct.App. 1998) (where ambiguities in construction of tax statutes remain after application of other rules of statutory construction, courts will strictly construe the applicability of taxation against the taxing authority and in the taxpayer's favor); 3A N. Singer, *Statutes and Statutory Construction* § 66:3, pp. 24–25 (6th ed. 2003 Rev.) (footnotes omitted) ("Since the obligation to pay taxes arises only by force of legislative action, the nature and extent of that liability is determined by the legislative meaning. Therefore, all the rules of statutory construction are relevant in the interpretation of revenue measures").

[¶ 20] We conclude that the rule of strict construction of ambiguous tax statutes in favor of the taxpayer is a rule of last resort when other means of ascertaining the legislature's intentions have failed. *Compare Webster v. Regan,* 2000 ND 89, ¶ 11, 609 N.W.2d 733 ("interpretation of ambiguities in a grantee's favor is a last resort rule of construction, applied when all other means of ascertaining the parties' intent have failed"); *Kaler v. Kraemer,* 1999 ND 237, ¶ 19, 603 N.W.2d 698 ("a court should construe a contract against its drafter only when the uncertainty is not removed by application of other rules of contract interpretation"). Because we are able to ascertain the legis-

lature's intention from the legislative history, there is no need to resort to the strict construction rule.

[¶ 21] Amerada also argues the Commissioner incorrectly decided that his decision to exclude I.R.C. § 78 gross-up amounts from the statutory definition of foreign dividends "is not inconsistent with the Commissioner's own policy interpretation of the law, notwithstanding a contrary interpretation in an audit manual." In 1992 the Commissioner prepared a "Water's Edge Tax Guide" for use by the Tax Department's corporate income tax auditors stating that I.R.C. § 78 gross-up amounts were to be treated as foreign dividends under N.D.C.C. § 57–38.4–01(4). A corporate income tax auditor testified that after a 1995 review of the legislative history, the Tax Department determined that the gross-up amounts were not to be treated as foreign dividends. No change was made to the 1992 "Water's Edge Tax Guide" because, according to the corporate income tax auditor, he was the only person at the Tax Department performing corporate income tax audits at the time. According to the Commissioner, the "Water's Edge Tax Guide" is not published for distribution to taxpayers, but is an internal document used by the auditors and Amerada obtained its copy during the discovery process in this case. The Commissioner did not document the change in policy until 2002 after this case began.

■ [¶ 22] Amerada asserts that, because this internal policy was "an agency statement of general applicability which implements or prescribes law or policy" under N.D.C.C. § 28–32–01(11), the Commissioner should have promulgated an administrative rule on the subject under the rulemaking provisions of N.D.C.C. ch. 28–32. While it might have been preferable for the Commissioner to use the rulemaking procedure under N.D.C.C. ch 28–32, an administrative agency need not use the rulemaking process to correct an erroneous interpretation of a statute. See Amerada Hess Corp. v. Conrad, 410 N.W.2d 124, 129 n. 5 (N.D.1987); see also New Town Pub. Sch. Dist. No. 1 v. State Bd. of Educ., 2002 ND 127, ¶ 10, 650 N.W.2d 813 (administrative agency may reexamine a prior decision and the agency may depart from the prior decision if it distinguishes or rationally explains its departure); Koch Oil Co. v. Hanson, 536 N.W.2d 702, 709 (N.D.1995) (recognizing Tax Commissioner's failure to adopt a rule and failure to collect a tax in the past does not estop him from assessing a tax); Turnbow v. Job Service North Dakota, 479 N.W.2d 827, 831 (N.D.1992) ("NDCC 28–32–02 authorizes, but does not require, administrative agencies to adopt reasonable rules in conformity with the statutes they administer or enforce"); True v. Heitkamp, 470 N.W.2d 582, 587 (N.D.1991) (Tax Commissioner's failure to properly promulgate a rule does not require the Commissioner to accept a different unpromulgated rule or test urged by a taxpayer). In Amerada Hess, 410 N.W.2d at 133 (citations omitted), this Court explained:

> It is settled that, as a general rule, an administrative agency is not required to promulgate detailed rules interpreting every statutory provision that may be relevant to its actions, or covering every conceivable situation which might come before it. Rather, an administrative agency may announce new principles through adjudicative proceedings in addition to rule-making proceedings.

Amerada has not shown how it was harmed by the Commissioner's failure to promulgate a rule on treatment of I.R.C. § 78 gross-up amounts. We reject Amerada's argument that this failure entitles it to prevail.

[¶ 23] We conclude the Commissioner correctly concluded that Amerada's I.R.C. § 78 gross-up amounts are not foreign dividends for purposes of N.D.C.C. §§ 57–38.4–01(4) and 57–38.4–02(2).

### B

[¶ 24] Amerada argues the Commissioner incorrectly concluded that the income of its 80/20 corporation and the dividends paid by that 80/20 corporation to its parent may properly be included in the taxable income of the water's edge group because the inclusion of the dividends allegedly results in double taxation. Again, some background is helpful to understand the parties' positions.

[¶ 25] During the relevant tax years, Amerada owned 100 percent of a Delaware corporation known as AHOC Abu Dhabi ("AHOC"), which is a corporation with less than 20 percent of its property and payroll located within the United States. A corporation which is incorporated in the United States, which is eligible to be included in a federal consolidated return, and which has less than 20 percent of its property and payroll assigned to locations within the United States is an "80/20 corporation." *See* N.D.C.C. § 57–38.4–01(5); N.D. Admin. Code § 81–03–05.2–01(4). AHOC is an 80/20 corporation, and as such, it is specifically excluded from the water's edge group under N.D.C.C. § 57–38.4–01(8)(a). Under N.D.C.C. § 57–38.4–02(2)(a) and (c), 60 percent of net book income from 80/20 corporations must be included in the income of the water's edge group for tax years beginning before December 31, 1994, and 30 percent of net book income must be included in the income of the water's edge group for tax years beginning after December 31, 1994. *See* N.D.C.C. § 57–38.4–01(5) (defining "[i]ncome from 80/20 corporations" as "net book income after taxes"). During the tax year ending December 31, 1994, AHOC had $10,193,000 of net book income and 60 percent of this amount, or $7,135,100, was included in the income of the water's edge group. During the tax year ending December 31, 1995, AHOC had $11,201,054 of net book income, and 30 percent of this amount, or $3,360,300 was included in the income of the water's edge group.

[¶ 26] During the 1994 tax year, AHOC distributed $551,570 of its net book income to its parent, Amerada, as a dividend. During the 1995 tax year, AHOC distributed $499,559 of its net book income to Amerada as a dividend. The Commissioner has promulgated N.D. Admin. Code § 81–03–05.2–04(2)(b), which provides:

2. Income for the water's edge group must be computed on the same basis as federal taxable income, except as provided for in the following subdivisions and in subsection 2 of North Dakota Century Code section 57–38.4–02, and plus or minus the adjustments provided for in North Dakota Century Code section 57–38–01.3 with the exception of subdivision c of subsection 1 of North Dakota Century Code section 57–38–01.3:

. . . .

b. Transactions between a member of the water's edge group and an affiliated corporation that has been excluded from the group must be included.

Under this provision, the Commissioner concluded that, although the income giving rise to the Amerada dividends has already been included in the income of the water's edge group, 100 percent of the AHOC dividends distributed to Amerada during the 1994 and 1995 tax years must also be included in the income of the water's edge group. The Commissioner required that the intercompany dividends between

AHOC and Amerada that were eliminated in Amerada's consolidated federal tax return be added back for purposes of its state tax return.

[¶ 27] Amerada does not contend the Commissioner exceeded his statutory authority in promulgating N.D. Admin. Code § 81–03–05.2–04(2)(b). Rather, Amerada asserts that the inclusion of the intercompany dividends destroys the "parity" in the treatment of foreign corporations and 80/20 corporations contemplated by N.D.C.C. § 57–38.4–02 and results in double taxation. We reject Amerada's argument for several reasons.

[¶ 28] The Commissioner's interpretation of this complex and technical subject does not contradict the language of N.D.C.C. § 57–38.4–02 and is entitled to appreciable deference. *See Kinney Shoe Corp. v. State ex rel. Hanson*, 552 N.W.2d 788, 790 (N.D.1996). While there may be a desire to avoid double taxation as a matter of public policy, there is no constitutional prohibition against double taxation. *See, e.g., Illinois Cent. R.R. Co. v. State of Minnesota*, 309 U.S. 157, 164, 60 S.Ct. 419, 84 L.Ed. 670 (1940); *Cincinnati Bell Tel. Co. v. City of Cincinnati*, 81 Ohio St.3d 599, 693 N.E.2d 212, 218 (1998); 71 Am.Jur.2d *State and Local Taxation* § 27 (2001), and cases collected therein. We recognize that under N.D.C.C. § 57–38–01.3(2), the Commissioner is "authorized to prescribe rules and regulations to prevent requiring income that had been previously taxed under this chapter from being taxed again because of the provisions of this chapter," and that avoiding double taxation is a permissible legislative goal. *D.D.I., Inc. v. State ex rel. Clayburgh*, 2003 ND 32, ¶ 15, 657 N.W.2d 228. Nevertheless, "determining the taxable income of multinational corporations is hardly an exact science," *Minnesota Mining*, 418 N.W.2d at 281, and the legislature has given the

Commissioner discretion to "impose necessary conditions other than the imposition of worldwide combination to prevent tax avoidance or to clearly reflect income in accordance with chapter 57–38.1." N.D.C.C. § 57–38.4–03.

[¶ 29] Moreover, this Court has defined "double taxation" as "the 'requirement that one person or known subject of taxation shall directly contribute twice to the same burden, while other subjects of taxation, belonging to the same class, are required to contribute but once.'" *In re First Nat'l Bank of Hillsboro*, 25 N.D. 635, 642–43, 146 N.W. 1064, 1067 (1898) (quoting *Second Ward Sav. Bank v. Milwaukee*, 94 Wis. 587, 69 N.W. 359, 362 (1896)). A Tax Department corporate income tax auditor testified at the administrative hearing that North Dakota had not engaged in double taxation of Amerada's income:

MR. SWIFT:

[H]ere's how the water's edge election works in regard to ... 80/20 corporations. 80/20 corporations are allowed to deduct their taxable income from the North Dakota tax base.... Taxable income is almost always greater than book income. That's why they made the election. If it wasn't to their advantage to elect to be an 80, to make a water's edge election, they wouldn't do it. So you have a situation where they ... a corporation, in this case Amerada Hess, makes ... an election to file in the water's edge method because it's to their advantage to do so. They can ... eliminate all of their foreign subsidiaries from the North Dakota tax base. They can eliminate all of their 80/20 corporations, which are U.S. corporations, that are doing business overseas, from the North Dakota tax base. Mechanically how it works is that for an 80/20 corporation they will deduct their ... United States federal taxable income from the

North Dakota tax base. They will then add back, in this case in 1994, 60 percent of their book income ... and in 1995, 30 percent of their book income. Typically book income is less than taxable income. It doesn't ... necessarily have to be, but it often is. At any rate, if you deduct 100 percent of the number and add back 60 percent or 30 percent, you are not taxing more than 100 percent of their federal taxable income. In this particular case, the dividend that AHOC Abu Dhabi paid to Amerada Hess was around a half a million dollars in 1994 and 1995. If you add that half a million dollars to the 60 percent of book income and 30 percent of book income respectively, ... I do not believe ... you get anywhere close to their 100 percent of their federal taxable income. So in this case, it is my opinion we are not dealing with a case of double taxation. We have not even subjected 100 percent. Not even 100 percent of AHOC Abu Dhabi's taxable income is in the North Dakota tax base.

MR. MORRISON:

And you agree that 60 percent and 30 percent, depending upon which year you're in, of the book income is included in the taxable income because the Legislature said that's how it's going to be taxed?

MR. SWIFT:

That's correct.

MR. MORRISON:

And in spite of the fact that the income of AHOC Abu Dhabi was included in the manner prescribed by the Legislature, the Tax Department's position is that you can tax again by taxing the dividend distribution to the parent. Is that correct?

MR. SWIFT:

We're not taxing it again. We ... are taxing a dividend distribution that ...

AHOC Abu Dhabi made to the parent, but we are not taxing 100 percent of AHOC['s] ... book income, we are not taxing 100 percent AHOC Abu Dhabi's taxable income.

The ALJ found the Commissioner's explanation persuasive:

The Commissioner's taxation of the inter-company dividend and a portion of AHOC's net book income, while arguably unfair, is acceptable tax policy, based on the applicable statutes and rules, and is not unconstitutional. The Commissioner's explanation of how an .80/20 corporation is treated under the water's edge filing method is ... easily understandable and consistent with the law. What [Amerada Hess] confuses with double taxation is, in effect, two separate entities being taxed on income derived from two separate events. Amerada Hess elected the water's edge method. Therefore, the treatment of AHOC dividends paid to [Amerada Hess] as a taxable event, as well as the treatment of a portion of AHOC's book income being attributable to Amerada Hess as a taxable event is the logical and lawful result of its election. Accordingly, under the law, AHOC dividends must be included in [Amerada Hess's] taxable income.

[¶ 30] We conclude the Commissioner's findings are supported by a preponderance of the evidence, the conclusions of law and order are supported by the findings of fact, and the order that AHOC's dividends must be included in Amerada's taxable income is in accordance with the law.

### III

[¶ 31] The judgment is affirmed.

[¶ 32] DANIEL J. CROTHERS, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.

VANDE WALLE, Chief Justice, concurring specially.

[¶ 33]   This is yet another case in which rules and regulations adopted by the Tax Commissioner might well have prevented the current proceedings.  *See, e.g., Koch Oil Co. v. Hanson,* 536 N.W.2d 702 (N.D. 1995); *True v. Heitkamp,* 470 N.W.2d 582, 593 (N.D.1991) (VandeWalle, J., concurring and dissenting); *Amerada Hess Corp. v. Conrad,* 410 N.W.2d 124, 127 (N.D.1987) (VandeWalle, J., concurring in part and dissenting in part); *Rocky Mountain Oil & Gas Ass'n v. Conrad,* 405 N.W.2d 279, 284 (N.D.1987) (VandeWalle, J., dissenting).

[¶ 34]   Unitary business taxation, the Uniform Division of Income for Tax Purposes Act, as found in N.D.C.C. ch. 57–38.1, the water's edge method codified in N.D.C.C. ch. 57–38.4, treating foreign tax credits as foreign dividends are at best complex, generally ambiguous and at times inherently incomprehensible concepts except, perhaps, to their progenitors.  It is in just such a situation the department charged with administering the law, in this case the Tax Commissioner, should enact rules and regulations to explain in writing the Commissioner's interpretation of the law.  Concededly, reducing to writing the interpretations necessary to administer the concepts in these laws might be a challenge but the rulemaking process contemplated by N.D.C.C. ch. 28–32 may very well serve to inform the Commissioner as well as those whose businesses are governed by the unitary laws.  And, while the majority opinion suggests it "might have been preferable for the Commissioner to use the rulemaking procedure" similar suggestions to the Commissioner have been ineffective as noted by the cases cited above.

[¶ 35]   I am particularly concerned that in this instance the change in the "internal" policy was not announced until after the audit in this case, in other words after the tax returns had been filed and during the course of the audit.  Although, according to the auditor, the change was made in 1995 after a review of the legislative history, it was not announced until the notice of determination was issued in 2000.  That necessarily means the tax returns would be incorrect when filed.  I do not understand the logic of such a procedure.

[¶ 36]   I have previously dissented in those instances in which the Commissioner has changed an interpretation without recourse to the rulemaking process.  I do not do so here, because a rule or interpretation of a statute cannot contradict the meaning and intent of the statute being implemented by the interpretation.  I am convinced that the majority opinion correctly determines legislative intent from the legislative history cited therein and I therefore concur in the result.  But, how much simpler it would have been if, in 1995, the Commissioner had adopted rules to this effect, notwithstanding the Water's Edge Tax Guide "is not published for distribution to taxpayers, but is an internal document used by the auditors" and that the corporate income tax auditor "was the only ·person at the Tax Department performing corporate income tax audits at the time."  It would be better if the taxpayers, the objects of the audit, were also informed of the interpretation, preferably ahead of the time the tax returns are filed.  While such a procedure might not result in headlines as to how much in additional taxes had been recovered as a result of the audit, it would make the work of the auditor, the taxpayers and the courts, much less complicated.

[¶ 37]   Gerald W. Vande Walle, C.J.