2012 ND 80

**Fred M. HECTOR, Jr., Petitioner and Appellant,**

v.

**CITY OF FARGO, a political subdivision of the State of North Dakota, Respondent and Appellee.**

No. 20110187.

Supreme Court of North Dakota.

April 10, 2012.

Rehearing Denied May 3, 2012.

Jonathan T. Garaas, Fargo, N.D., for petitioner and appellant.

Jane L. Dynes (argued) and Ronald H. McLean (appeared), Fargo, N.D., for respondent and appellee.

CROTHERS, Justice.

[¶ 1] Fred M. Hector, Jr., appeals from a district court judgment affirming the Fargo Board of City Commissioners' ("City Commission") decision approving special assessments against his property. In his appeal to the district court, Hector alleged at least 34 errors existed in the proceedings for the special assessments. In his appeal to this Court, he raised sixteen issues and subissues, but for purposes of this decision we consolidated his issues into four related subjects. Hector argues the total amount assessed for an improvement project was improperly calculated and should have been based on the City's true costs for the project, the method used to determine the amount assessed against his property was improper, the Assessment Commission failed to comply with certain statutory requirements and the City Commission failed to properly review the Assessment Commission's decision. We affirm.

I

[¶ 2] Improvement District 5314 was created in August 2007 to improve infrastructure in south Fargo along 52nd Avenue South and Interstate 29. The improvement district included property from the Red River to the Sheyenne River and from 40th Avenue South to approximately 52nd Avenue South. On August 27, 2007, the City Commission adopted a resolution of necessity for the improvement district, which declared it was necessary to construct bridges, PC concrete pavement, grading, storm sewers, water main distribution, signals, street lighting, bike trails, and incidentals. The resolution also declared the entire cost of the improvements would be specially assessed against the benefitted property in the district in amounts proportionate to but not exceeding the benefit the property derives from the improvements. The City Commission received some protests from property owners but declared the protests insufficient.

[¶ 3] An August 2007 City Engineer's Report estimated the project would cost $54,826,585. The Report proposed the project would be funded from various sources, including:

"Street Sales Tax $ 4,493,862
Water Utility Funding $ 5,475,540
Federal Funding $24,410,000
Special Assessments $12,840,948
Miscellaneous $ 7,056,232"

[¶ 4] The project was divided into three phases. Phase 1 consisted of paving, water main installations and storm sewer upgrades along 52nd Avenue South from University Drive to 31st Street South. Phase 2 consisted of all roadway improvements from 31st Street South to 38th Street South and the Interstate 29 and 52nd Avenue South interchange, including frontage roads. Phase 3 consisted of paving, water main distribution and storm sewer construction west on 52nd Avenue South from 38th Street South to the Sheyenne River. Phases 1 and 2 were partially funded by state and federal funds, and the North Dakota Department of Transportation ("DOT") was involved with the administration of those parts of the project.

[¶ 5] After the project was substantially completed in 2009, the City Commission adopted a resolution directing special assessments be levied. The total cost of the project was approximately $58 million, and property owners were assessed a total of $16,343,400.03. The proposed special assessments followed the City's Infrastructure Funding Policy, which was used to initially set the amount of special assessment against each property. The City Commission had adopted a general infrastructure funding policy to make similar assessments for similar projects as uniform as possible throughout the city. The policy "caps" the amount specially assessed against a property, and a formula is used to provide the Special Assessment Commission with estimated assessments for various projects based on front footage or square footage. The amount determined under the formula is considered to be the amount the property benefits from the improvement without considering the actual cost of the improvement.

[¶ 6] On August 25, 2009, the Special Assessment Commission reviewed the special assessment list containing assessments derived from the policy for property in the improvement district. In late August and early September 2009, the City sent property owners notice of the proposed assessments against their properties.

[¶ 7] Hector owns four parcels within Improvement District 5314. Two parcels are north of 52nd Avenue South and west of Interstate 29 and the other two parcels are directly east of Interstate 29 and north of 52nd Avenue South. Hector's four parcels together are approximately 175 acres. Hector received notices of the special assessments on his property in August and September 2009. The special assessments against Hector's property total $6,856,274.45, and the bulk of the assessments are for the construction of frontage roads on his property. Hector and the DOT entered into a written agreement about the frontage roads, including a location for one of the roads to enhance the value of Hector's property. The DOT provided funding for a typical two-lane asphalt road for the frontage roads. In order to support future development, however, the City designed the frontage roads in an urban design, with pavement and gutter. The cost of improvements above the funding the DOT provided for the frontage roads initially was borne by the City and was subject to special assessments. Hector was assessed $4,577,141.63 for the frontage roads. The City reached an agreement with Hector to defer the payment of the special assessments against his property for ten years.

[¶ 8] On September 13, 2009, Hector filed an objection to the special assessments against his property with the Special Assessment Commission. A Special Assessment Commission meeting was held

on September 14, 2009, and Hector appeared through his counsel. The Special Assessment Commission heard Hector's argument and continued the meeting to allow the City time to respond to Hector's objections. On September 15, 2009, the Special Assessment Commission confirmed the assessment list. The assessment list was filed with the City Auditor's Office, and notice was published in the official city newspaper on September 21, 2009.

[¶ 9] On September 29, 2009, the Special Assessment Commission reconvened its meeting and Hector again appeared through counsel. He filed a supplement to his prior objection to the assessments and was provided an opportunity to present argument about his objection. The Special Assessment Commission again continued the meeting to allow the City time to respond to Hector's objections.

[¶ 10] The Special Assessment Commission reconvened its meeting on October 15, 2009. Hector also appeared at that meeting through counsel and filed further materials to supplement his objections. After hearing Hector's objections, the Special Assessment Commission approved the assessment list and assessments against Hector's property.

[¶ 11] On October 19, 2009, Hector appealed the Special Assessment Commission's decision to the City Commission. At a City Commission meeting, Hector appeared through counsel and was given an opportunity to be heard on his appeal. The City Commission approved the special assessment lists and assessments against Hector's property.

[¶ 12] On November 9, 2009, Hector appealed from the City Commission's decision approving the special assessment lists to the district court, alleging 34 separate errors and arguing the City Commission acted arbitrarily, capriciously, or unreasonably and contrary to the law. The district court affirmed the City Commission's decision.

II

[¶ 13] This Court has outlined its limited review of a local governing body's decision on special assessments:

" 'The special assessment commission is in essence a legislative tribunal created by legislative authority to "(1) determin[e] the benefits accruing to the several tracts of land in an improvement district by reason of the construction of an improvement and (2) assess[ ] the costs and expenses thereof against each tract in proportion to the benefit received." Accordingly, judicial review is limited to assuring that local taxing authorities do not act arbitrarily, capriciously, or unreasonably. Courts are not to act as a super grievance board, and we do not try special assessment cases anew or reweigh the evidence. Rather, we begin with the presumption that assessments for local improvements are valid, and the burden is on the party challenging the validity of the assessments to demonstrate they are invalid.' We must affirm the decision of a local governing body unless it acted arbitrarily, capriciously, or unreasonably, or there is not substantial evidence supporting the decision. . . . A local governing body's failure to correctly interpret and apply controlling law constitutes arbitrary, capricious, and unreasonable conduct."

*Hector v. City of Fargo*, 2010 ND 168, ¶ 5, 788 N.W.2d 354 (quoting *Bateman v. City of Grand Forks*, 2008 ND 72, ¶ 10, 747 N.W.2d 117) (citations omitted).

III

[¶ 14] Hector argues the total amount assessed for the improvement project was

improperly calculated and should have been based on the City's true costs.

## A

[¶ 15] Hector first contends the City improperly included certain costs in the total cost of the project, including the cost of work not authorized by the resolution of necessity, fees for work completed by city employees and interest costs.

### 1

[¶ 16] Hector claims the City's total cost of the project improperly included the costs of frontage roads on his property, the costs of improving a drain and the costs of acquiring land related to a drain. He claims those improvements were not authorized by the adopted resolution of necessity.

[¶ 17] Section 40–22–06, N.D.C.C., describes requirements for a resolution of necessity for special assessments for improvements and states:

> "If any portion of the cost is to be paid by the levy of special assessments, the governing body shall by resolution declare the necessity of the improvement, setting forth its general nature, the approximate amount or fraction of the cost which the municipality will be obligated to pay under the agreement, and the fact that this amount, or such lesser amount as the governing body may specify, is proposed to be paid by the levy of special assessments. . . ."

An engineer's report must be filed and approved before the governing body adopts the resolution of necessity, and "[t]he resolution must refer intelligibly to the engineer's report and include a map of the . . . proposed improvement districts." N.D.C.C. § 40–22–15. The engineer's report must include the "general nature, purpose, and feasibility of the proposed improvement and an estimate of the prob-able cost of the improvement." N.D.C.C. § 40–22–10.

[¶ 18] In this case, the resolution of necessity declared it was necessary "to construct Bridges, PC Concrete Pavement, Grading, Storm Sewer, Water Main Distribution, Signals, Street Lighting, Bike Trail & Incidentals . . . according to the Plans and Specifications approved by the Board of City Commissioners of the City of Fargo. . . ." The engineer's report stated the project would include the construction of a storm sewer system and an "I–29 interchange to include all quadrant ramps and adjacent frontage roads." Hector does not claim the resolution of necessity did not comply with statutory requirements or failed to describe the proposed improvements with sufficient specificity.

[¶ 19] Hector contends the City erred in including the cost of improvements to a drain and the cost to purchase land for use as a retention pond because these improvements were not originally approved as part of the resolution of necessity and the engineer's report. However, Hector does not cite specific evidence in the record supporting his claim that these improvements were not originally a part of the proposed improvements. The resolution of necessity states there was a need for construction of storm sewer and pavement, and the engineer's report stated the construction would include the storm sewer system. The drain and water retention pond are a part of the storm sewer system and, therefore, were within the scope of the general nature of the work authorized by the resolution of necessity. Moreover, the land for the water retention pond was purchased with sales tax funds and not with money derived from special assessments.

[¶ 20] Hector also claims that after the resolution of necessity was adopted the frontage roads located on his property

were improperly changed from two-lane asphalt roads, which the state and federal governments would have completely funded, to modern urban roads. He contends he had a contract with the DOT for the frontage roads which did not assess him for any of the costs of those roads. He contends a new resolution of necessity was required to change the design of the frontage roads and to permit the City to assess the increased cost against his property.

[¶ 21] Under N.D.C.C. §§ 40–22–06, 40–22–10, and 40–22–15, the resolution of necessity and engineer's report must include the general nature of the improvements and an estimate of the probable cost. The engineer's report includes an estimate of the probable cost, and statutory language indicates changes may .be made in the design or type of material used after the resolution is passed and the engineer's report is received. *See* N.D.C.C. §§ 40–22–10, 40–22–11 and 40–22–12 (the detailed plans and specifications for construction may include estimates for several different types of pavement). The engineer's report specifically stated the project would include the "[c]onstruction of I–29 Interchange to include all quadrant ramps and adjacent frontage roads." The resolution of necessity and engineer's report did not limit the type of frontage roads to two-lane asphalt roads, and a new resolution of necessity was not required to change the design of the frontage roads.

[¶ 22] Although Hector had an agreement with the DOT about the frontage roads, that agreement was not with the City and did not limit changes the City could make to the design of the roads. In September 2007, Hector entered into an agreement with the DOT, specifying where one of the frontage roads would be placed and the conditions for the placement of utilities and stating the DOT agreed to purchase the property required for the frontage roads. Although the agreement included certain conditions for the roads' construction, it did not require the roads to be two-lane asphalt roads. Hector and the DOT did not agree on the type of road that would be built or how much funding the DOT would provide, and Hector has cited no other authority precluding the City from deciding what type of road would be constructed.

[¶ 23] In November 2007, the City reached an agreement with the DOT for cost participation for the construction of the frontage roads. The agreement states:

"The City

a. Will pay all construction, right of way, and easement costs for this project over $990,000 for all items which are determined eligible for federal aid participation. This total cost will include the actual construction cost plus 10 percent for the preliminary and construction engineering; and

b. Will pay 100 percent of the construction costs plus 10 percent for the preliminary and construction engineering of all items not eligible for federal aid participation."

The agreement states the preliminary cost estimate of the project is $6,715,933, with the City's estimated share being $5,725,933. The City was free to design the frontage roads as it wanted, and the City's agreement with the DOT evidences that the City intended the roads to be more than two-lane asphalt frontage roads when they entered the agreement with the DOT for funding.

[¶ 24] We conclude the frontage roads, drain improvements, and land for a drain were authorized improvements under the adopted resolution of necessity and the City did not fail to correctly interpret the law, nor did it abuse its discretion by including the costs of these improvements in the total cost of the project.

## 2

[¶ 25] Hector argues the City improperly included engineer fees and attorneys fees in the total cost of the project because those costs were attributed to city engineers and attorneys, which already were paid through general taxes. Hector also contends the City improperly included interest costs in the total cost of the project.

[¶ 26] Section 40–23–05, N.D.C.C., states the total cost of the improvement shall include "engineering . . . and attorney's fees for any services in connection with the authorization and financing of the improvement, . . . and all expenses incurred in the making of the improvement and levy of assessments therefor." Although the City's general budget includes amounts for these services by city employees, the City presented evidence some of the revenue used to pay for these expenses comes from assessments and those amounts were also included in the budget. The amount the City charges for the engineering and other administrative fees for an improvement project varies depending on the type of project and the City's involvement. The plain language of N.D.C.C. § 40–23–05 permits the City to include these fees in the total cost of the improvement. The City claims the interest expenses were related to the carrying costs between authorization and assessment associated with the project, which it may include in the total cost of the project. Section 40–23–05, N.D.C.C., permits the City to assess all of its expenses incurred in making the improvements and assessments. We conclude the City did not fail to correctly interpret the law, nor did it abuse its discretion by including these amounts in the total cost of the project.

## B

[¶ 27] Hector claims the City converted federal funds that were intended to be used to fund the special assessment project. He contends $31,774,930.47 in federal funds were dedicated to certain parts of the project and the City transferred these funds to its general fund for other city uses. The City contends no evidence exists it converted any federal funds, the costs of the project increased after the resolution of necessity was passed causing the special assessments to increase, the contracts were administered by the DOT, the DOT billed the City for its portion of the costs and the DOT received the federal funds for the project.

[¶ 28] The evidence supports the City's argument. The city engineer, Mark Bittner, was questioned about the improvement project at the October 15, 2009, Special Assessment Commission hearing. Bittner stated that the first phase of the improvements was city designed and constructed but, under a DOT contract, the City reimbursed the DOT for the City's share of the costs. He said the DOT designed and constructed phase 2 of the project, the City requested some changes in that part of the project and was required to pay the increased costs, and the City assessed some of those costs and federal funds covered the balance. Bittner stated the third phase was designed and bid by the City and funded by sales tax revenues and special assessments. Bittner stated the DOT usually acts as a "banker" on large projects like this with the State paying the expenses and billing the City for the City's share of the expenses on a monthly or quarterly basis. He stated the DOT acted as the "banker" for the first and second phases of the project and the City reimbursed the DOT for its share of the cost. On the record in this case, we conclude Hector failed to establish the City converted federal funds.

## C

[¶ 29] Hector argues the total amount assessed for the project was im-

proper because it exceeded the amount listed in the resolution of necessity. He contends the resolution and the approved engineer's report contain the final estimate of costs for the project and the assessments are limited to the amount stated in the resolution of necessity under N.D.C.C. § 40–22–06.

[¶ 30] The interpretation of a statute is a question of law, which is fully reviewable on appeal. *GO Comm. ex rel. Hale v. City of Minot*, 2005 ND 136, ¶ 9, 701 N.W.2d 865. In interpreting a statute, our primary objective is to ascertain the intention of the legislation. *Amerada Hess Corp. v. State ex rel. Tax Comm'r*, 2005 ND 155, ¶ 12, 704 N.W.2d 8. We give words their plain, ordinary, and commonly understood meaning, unless they are specifically defined or the drafters clearly intended otherwise. *See* N.D.C.C. § 1–02–02. The language of a statute must be interpreted in context and according to the rules of grammar. N.D.C.C. § 1–02–03. Statutes are construed as a whole and harmonized to give meaning to related provisions. N.D.C.C. § 1–02–07. When the language is clear and unambiguous, "the letter of it is not to be disregarded under the pretext of pursuing its spirit." N.D.C.C. § 1–02–05. A statute is ambiguous if it is susceptible to different, rational meanings. *Amerada Hess*, at ¶ 12. If a statute is ambiguous, the court may consider other extrinsic aids to determine the intent of the legislation. *See* N.D.C.C. § 1–02–39.

[¶ 31] Section 40–22–06, N.D.C.C., authorizes agreements between a city and a state or federal agency or certain other governmental entities for certain improvements and provides:

"If any portion of the cost is to be paid by the levy of special assessments, the governing body shall by resolution declare the necessity of the improvement, setting forth its general nature, the approximate amount or fraction of the cost which the municipality will be obligated to pay under the agreement, and the fact that this amount, or such lesser amount as the governing body may specify, is proposed to be paid by the levy of special assessments upon property determined to be benefited by the improvement."

[¶ 32] Hector contends this provision limits the amount a city may specially assess for an improvement to no more than the amount stated in the resolution of necessity and engineer's report. Hector relies on a 1985 attorney general's advisory letter to support his argument. *See* Letter from Attorney General Nicholas J. Spaeth to State Senator Jack W. Ingstad, November 5, 1985. The letter states that the language of N.D.C.C. § 40–22–06 implies a city's costs for an improvement may not exceed the amount estimated in the resolution of necessity and that "the amount to be paid by the levy of special assessments as provided for in the resolution of necessity is a maximum amount and may not be exceeded." *Id.* However, "we follow opinions of the Attorney General only if they are persuasive." *Grand Forks Homes, Inc. v. State ex rel. State Bd. of Equalization*, 2011 ND 65, ¶ 13, 795 N.W.2d 335. In this case, the opinion is not persuasive.

[¶ 33] Under the plain language of N.D.C.C. § 40–22–06, the resolution of necessity must include the "approximate amount or fraction of the cost" that the city will be obligated to pay under its agreement with the state or federal agency and that the amount proposed to be specially assessed will be equal to or less than the amount the city is obligated to pay. The amounts listed in the resolution of necessity include the approximate cost to the city and the amount proposed to be

assessed. The resolution of necessity only contains an estimate of the probable costs of the improvement.

[¶ 34] Moreover, when N.D.C.C. § 40–22–06 is read together with other statutory provisions, it is clear the legislation did not intend that the amount proposed to be specially assessed as contained in the resolution of necessity was the maximum amount that may be assessed. A resolution of necessity must refer to the engineer's report, which includes an estimate of the probable costs of the improvement. *See* N.D.C.C. §§ 40–22–10 and 40–22–15. The detailed plans and specifications for construction of the improvements are not required before the resolution of necessity is passed; rather, the resolution of necessity must be passed after the engineer's report has been filed and approved, and the detailed plans and specifications may be prepared at any time after the engineer's report is received. *See* N.D.C.C. §§ 40–22–11 and 40–22–15. Section 40–22–29, N.D.C.C., addresses situations when the actual costs exceed those estimated in the engineer's report and states:

"Before adopting or rejecting any bid filed under the provisions of this chapter, the governing body shall require the engineer for the municipality to make a careful and detailed statement of the estimated cost of the work for which proposals were advertised under section 40–22–19. The governing body may not award the contract to any bidder if the engineer's estimate prepared pursuant to this section exceeds the engineer's estimate of the cost of the work prepared pursuant to subsection 1 of section 40–22–10 by forty percent or more."

The second sentence of this provision was added to N.D.C.C. § 40–22–29 in 1985 specifically to address the problem of costs greatly exceeding the amounts estimated in the engineer's report. *See Hearing on*

*S.B. 2477 Before the Senate Indus., Bus., and Labor Comm.*, 49th N.D. Legis. Sess. (Feb. 5, 1985) (testimony of attorney Al Wolf) (intent is to provide special notice if special assessments are much higher than projected); *Hearing on S.B. 2477 Before the House Political Subdivisions Comm.*, 49th N.D. Legis. Sess. (March 14, 1985) (testimony of Senator John Olson, sponsor of the bill) (intent of bill is to resolve problems that occur with special assessment districts when an increase in the cost of the project over the original bid exists). Furthermore, N.D.C.C. § 40–23–24 provides:

"If the costs of an improvement determined and assessed under section 40–23–07 or 40–23.1–04 exceed the costs of the work as contained in the engineer's estimate under section 40–22–10 by seventy percent or more, the governing body of the city shall secure an audit of all costs included in the assessment for the project, prepared in accordance with generally accepted auditing standards."

Section 40–23–05, N.D.C.C., governs assessments and states that any time after the total cost for work has been estimated as nearly as practicable, "the governing body may direct assessments to be levied for the payment of all or any part of such cost[.]" That language does not limit the amount a city may assess to the amount stated in the engineer's report; rather, the city may assess for all or a part of the cost, including the estimated construction cost under the terms of the contract and a reasonable allowance for the cost of extra work. N.D.C.C. § 40–23–05.

[¶ 35] Considering these statutory provisions together, the plain language evidences a legislative intent that the engineer's report and resolution of necessity contain an estimate of the cost of the project and that the final cost and amount to be assessed could exceed the amounts

listed in the resolution of necessity and engineer's report. Hector does not claim the City failed to comply with N.D.C.C. §§ 40–22–29 or 40–23–24. We conclude the total amount of the special assessments did not improperly exceed the amounts estimated in the resolution of necessity and engineer's report.

## D

[¶ 36] Hector argues the City improperly assessed property owners based on the total cost of the project and not on the true cost to the City. He claims the assessments exceeded the amount the City actually paid for the improvements. The City contends it incurred $26,255,716 in costs for the project and it assessed $16,343,400 of its costs as suggested in the Infrastructure Funding Policy.

[¶ 37] "'An assessment which exceeds the cost of the improvement or a final estimate of such cost, ... is invalid to the extent of the excess.'" *Reed v. City of Langdon,* 78 N.D. 991, 1000, 54 N.W.2d 148, 154 (1952) (quoting 63 C.J.S. *Municipal Corporations* § 1415, at 1203; now at 64 C.J.S. *Municipal Corporations* § 1610, at 348 (2011)); *see also* N.D.C.C. §§ 40–22–06 and 40–23–05 (a city may assess for all or any part of the total cost of an improvement). Hector provided no evidence the assessments exceeded the actual cost of the project. The City Auditor's October 13, 2009, certification of costs showed the total cost of the project for the City was $26,255,716.56, and of that $16,343,400.03 would be specially assessed. Hector has failed to establish the assessed amounts exceeded the City's costs.

## E

[¶ 38] The City did not improperly calculate the total cost of the project and the total amount to be assessed. We conclude the City did not act arbitrarily, capriciously, or unreasonably.

## IV

[¶ 39] Hector argues his property was improperly assessed.

## A

[¶ 40] Hector contends the Special Assessment Commission failed to follow the statutorily mandated process requiring special assessments to be based on the benefit to the property and instead used its Infrastructure Funding Policy, which is a legislatively adopted formula. He claims the Special Assessment Commission first calculated the "capped" costs using the formula and based the assessment on that calculation without determining the benefit to the property. He also claims the Special Assessment Commission improperly based the assessment for some property on front footage and for other property on square footage.

[¶ 41] Any time after the contract and bond for the improvement work have been executed and approved and the total cost of the work has been estimated as nearly as practicable, the municipality's governing body may direct assessments be levied for the payment of all or any part of the cost of the improvement. N.D.C.C. § 40–23–05. Section 40–23–07, N.D.C.C., provides requirements the special assessment commission must follow in calculating the amount to specially assess for improvements:

"Whenever the commission makes any special assessment, the commission shall determine the particular lots and parcels of land which, in the opinion of the commission, will be especially benefited by the construction of the work for which the assessment is to be made. The commission shall determine the amount in which each of the lots and parcels of

land will be especially benefited by the construction of the work for which such special assessment is to be made, and shall assess against each of such lots and parcels of land such sum, not exceeding the benefits, as is necessary to pay its just proportion of the total cost of such work, or of the part thereof which is to be paid by special assessment, including all expenses incurred in making such assessment and publishing necessary notices with reference thereto and the per diem of the commission."

[¶ 42] In *Bateman* we identified three requirements for a special assessment to comply with N.D.C.C. § 40–23–07:

" 'The special benefit accruing to each lot or parcel of land from the improvement must be determined. The special assessment levied against each lot must be limited to its just proportion of the total cost of the improvement. The assessment against any lot or parcel of land must not exceed the benefit which has been determined to have accrued thereto.' "

2008 ND 72, ¶ 11, 747 N.W.2d 117 (quoting *Cloverdale Foods Co. v. City of Mandan*, 364 N.W.2d 56, 61 (N.D.1985)).

 [¶ 43] A municipality has broad discretion to choose the method used to decide what benefits a property receives from an improvement and to apportion the costs to individual properties. *Bateman*, 2008 ND 72, ¶ 16, 747 N.W.2d 117. A municipality may adopt any method to apportion benefits that is fair and legal and secures an assessment that is in proportion to the benefits as nearly as possible when no rule of apportionment prescribed by statute or charter exists. *Serenko v. City of Wilton*, 1999 ND 88, ¶ 21, 593 N.W.2d 368. " '[T]he process of quantifying benefits accruing to each lot inevitably rests on the judgment and discretion of the special assessment commis-

sion. There simply is no precise formula for quantifying benefits.' " *Id.* (quoting *Haman v. City of Surrey*, 418 N.W.2d 605, 608 (N.D.1988)). Assessments may be apportioned according to " 'frontage, area, value of, or estimated benefits to, the property assessed, or according to districts or zones, or on any other reasonable basis that is fair, just, and equitable.' " *Serenko*, at ¶ 21 (quoting 63 C.J.S. *Municipal Corporations* § 1423, at 1212; now at 64 C.J.S. *Municipal Corporations* § 1618, at 356–57 (2011)). However, "[t]he method used to apportion the assessment cannot be arbitrary and must have some relation to the benefits." *Bateman*, at ¶ 16. The assessment to an individual property cannot exceed the benefits the property receives from the improvement. *Id.* at ¶ 20.

[¶ 44] In this case, the Fargo Infrastructure Funding Policy was used to estimate the benefits and amounts to specially assess for the improvement project. The Special Assessment Commission subsequently approved assessments that were generated under the policy. The Infrastructure Funding Policy was adopted to make assessments for similar projects uniform throughout the city. Fargo claims the policy "caps" the amounts that are specially assessed against a property for certain improvements by using a formula to determine the benefit a property receives for various projects based on front footage or square footage. The policy is used by city staff to suggest to the Special Assessment Commission the amount that should be assessed against a property. The City states property owners are not assessed more than the amount calculated. The City also argues the formula does not consider the actual cost of the improvements and the benefit calculated is generally less than the actual cost.

[¶ 45] We generally have upheld assessments based on a formula to deter-

mine the benefit a property receives from the improvement and the amount to assess. *See Serenko,* 1999 ND 88, ¶¶ 22–23, 593 N.W.2d 368 (benefits were determined and costs were apportioned based on square footage of the lots). In this case, the Special Assessment Commission complied with the statutory requirements and determined the benefit each property received for the improvements albeit using the policy as a guide. Although Hector argues the Special Assessment Commission improperly assessed some properties based on square footage and others on front footage, we have upheld similar assessment methods in prior cases. *See Bateman,* 2008 ND 72, ¶ 3, 747 N.W.2d 117 (benefits and assessments were calculated using front footage for residential properties and square footage for non-residential properties).

[¶ 46] We conclude the Special Assessment Commission did not abuse its discretion in choosing the method of assessment, the Special Assessment Commission determined the benefit to each property from the improvements and the method used for determining the special assessments was not arbitrary, capricious, or unreasonable.

## B

[¶ 47] Hector contends his property did not receive a benefit from the improvements because it is agricultural property and he does not need improved roads or municipal sewer and water.

[¶ 48] The special assessment commission may not make an assessment exceeding the benefit the property receives from the improvements. *Cloverdale Foods,* 364 N.W.2d at 60. However, we have said the benefit a property receives from an improvement does not depend solely on the property's current use:

" 'It is natural for the average property owner to resent the burden thus laid

upon him, and he easily persuades himself that the thing for which he is asked to pay is a detriment, rather than a benefit, to his land. . . . Indeed, the benefits to be derived in such cases are ordinarily not instant upon the inception or completion of the improvement, but materialize with the developments of the future. They are none the less benefits because their full fruition is postponed, or because the present use to which the property is devoted is not of a character to be materially affected by the improvement.' "

*Bateman,* 2008 ND 72, ¶ 23, 747 N.W.2d 117 (quoting *Haman,* 418 N.W.2d at 608).

[¶ 49] Hector's property is in a developing area, and there is potential for further development in the future. Hector negotiated with the DOT to reach an agreement on the location of the frontage road, ensuring placement would support future development of the property. Hector entered into an agreement with the City to defer collection of the special assessments against his property for a period of ten years to allow development to occur to blunt the impact of the assessment costs. The evidence supports the Special Assessment Commission's findings that Hector's property received a benefit from the improvements.

## C

[¶ 50] Hector argues his property was assessed differently from other property because he was assessed the entire cost of the frontage roads and because the Special Assessment Commission did not apply its infrastructure policy to cap the amount assessed. He claims he was assessed for the entire cost of the frontage roads and he should not have been assessed for any amount greater than his share of a 66–foot asphalt road.

[¶ 51] The Infrastructure Funding Policy provides that 100 percent of the cost of new local streets will be specially assessed and that assessments for collector streets are capped at the equivalent of a 66–foot asphalt road. Hector does not cite any evidence in the record indicating whether the frontage roads on his property are considered local or collector streets. Rather, the response to Hector's objections from the Special Assessment Coordinator and City Auditor states the amounts assessed for the frontage roads were for "local improvements." The evidence supports a "local" street, which under the Infrastructure Funding Policy, would be assessed at 100 percent of the cost. Hector has not shown the City failed to apply the Infrastructure Funding Policy in assessing his property.

## V

[¶ 52] Hector argues the Special Assessment Commission failed to comply with statutory notice requirements. He claims the Special Assessment Commission failed to give proper notice, including notice of hearings and notice of the assessment list.

[¶ 53] A special assessment commission is required to make a complete list of the benefits and assessments, including a list of the amount each lot or tract of land benefits from the improvement and the amount assessed. N.D.C.C. § 40–23–09. A certificate signed by a majority of the members of the commission certifying that the list is a true and correct assessment of the property must be attached to the list. *Id.* Once the assessment list is created, the special assessment commission must publish the list in the municipality's official newspaper, publish notice that the list is available for public inspection when the list includes more than five thousand lots or tracts, or send a letter to all property owners on the assessment list stating their assessments and publish a map outlining the assessment district with notice of the letters sent to property owners. N.D.C.C. § 40–23–10. The notice "must include the time and place of a . . . meeting to hear objections to assessments from [any] interested party." N.D.C.C. § 40–23–10(6). After the hearing, the special assessment commission shall confirm the assessment list and file the list in the office of the city auditor. N.D.C.C. § 40–23–12. The city auditor must publish notice in the municipality's official newspaper stating the assessment list was confirmed and is open to public inspection in the city auditor's office. N.D.C.C. § 40–23–13. The notice must also state the time and place where the governing body will act upon the assessment list. *Id.*

[¶ 54] Evidence in this record shows the special assessment list was created and the Special Assessment Commission reviewed the list on August 25, 2009. On August 31, 2009, and September 7, 2009, a map of the assessment district and a notice that letters about the assessments were sent to property owners was published in Fargo's official newspaper. Evidence establishes Hector received notice of the assessments to his property in late August and early September 2009. The letters included notice of the hearing before the Special Assessment Commission. The Special Assessment Commission hearing was held on September 14, 2009, and further hearings were held on September 29, 2009, and October 15, 2009, to allow the commission to address Hector's objections. The Special Assessment Commission confirmed the list on September 15, 2009, and reconfirmed the list on October 15, 2009. On September 21, 2009, the City Auditor's Office published notice in Fargo's official newspaper that the Special Assessment Commission confirmed the assessment list and that the list was available for public

inspection. Although Hector claims he was unable to locate the assessment list in the City Auditor's Office, evidence establishes the list was located in the Special Assessment Office, which is part of the City Auditor's Office. We conclude the Special Assessment Commission complied with the statutory notice requirements.

## VI

 [¶ 55] Hector argues the City Commission failed to perform its statutory duties and properly review the Special Assessment Commission's decision. He contends the City Commission cut off the hearing process and acted as a "rubber stamp" of the Special Assessment Commission.

[¶ 56] Any person aggrieved by a special assessment may appeal to the governing body from the decision of the special assessment commission. N.D.C.C. §§ 40–23–14 and 40–23–15. At a hearing on the appeal, the aggrieved person may "present the person's reasons why the action of the commission should not be confirmed." N.D.C.C. § 40–23–15.

[¶ 57] Hector was given an opportunity to appear and speak at the October 19, 2009 City Commission hearing. Hector also submitted written objections to the City Commission. The City Commission heard Hector's objections and they questioned the City's attorney, the Special Assessment Coordinator, and the City Auditor. Hector had an opportunity to be heard and present evidence, and the City Commission considered his objections. We conclude the City Commission complied with the statutory requirements for review of the assessments by the Special Assessment Commission.

## VII

[¶ 58] We have considered all the other arguments Hector raised, and we conclude they are without merit or do not affect the outcome of our decision. We conclude Hector failed to establish that the special assessments against his property were arbitrary, capricious, or unreasonable or that there was not substantial evidence supporting the City Commission's decision approving the assessment list as recommended by the Special Assessment Commission. We affirm the district court judgment.

[¶ 59] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM and CAROL RONNING KAPSNER, JJ., concur.

[¶ 60] The Honorable MARY MUEHLEN MARING, J., disqualified herself subsequent to oral argument and did not participate in this decision.